[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 11, 2007
THOMAS K. KAHN
CLERK

No. 06-11826

_____

D. C. Docket No. 04-02723-CV-T-24-TGW

DOUGLAS MCCLISH,
EDMUND HOLMBERG,

Plaintiffs-Appellants,

versus

RICHARD B. NUGENT,
Sheriff of Hernando County,
in his official capacity,
SHAWN TERRY,
Deputy, individually, et. al,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 11, 2007)**

Before ANDERSON and MARCUS, Circuit Judges and ALTONAGA,* District
Judge.

---

* Honorable Cecilia M. Altonaga, United States District Judge for the Southern District of
Florida, sitting by designation.

MARCUS, Circuit Judge:

In this civil rights case, Appellants Edmund Holmberg ("Holmberg") and Douglas McClish ("McClish") appeal from the district court's entry of final summary judgment for Appellees Deputy Shawn Terry, Deputy Christopher Calderone, and Sheriff Richard B. Nugent, all of the Hernando County, Florida Sheriff's Office. After thorough review, we affirm the district court's determination that Deputy Terry was entitled to qualified immunity for effecting a warrantless arrest of McClish within his home. However, because Holmberg was never convicted of a crime, we reverse the district court's judgment that his § 1983 wrongful arrest claim was barred by Heck v. Humphrey, 512 U.S. 477 (1994). Finally, we reverse the district court's dismissal of Appellants' state law claims pursuant to 28 U.S.C. § 1367(c)(3) and remand those claims as well.

**I.**

Taking the evidence in the light most favorable to the appellants, the essential facts and procedural history are these. Edmund Holmberg and Douglas McClish lived in a trailer home in Brooksville, Florida. At approximately 4:00 p.m. on October 13, 2001, Deputies Shawn Terry and Clifford Groves of the Hernando County Sheriff's Office responded to a complaint from McClish and Holmberg's

neighbors, the Padzurs, who said that Holmberg had been screaming profanities at them across the line separating the two properties. The complaint did not mention McClish, who was not home when the deputies first arrived. The deputies met with the Padzurs and then, stepping over a downed fence separating the two properties, informed Holmberg and McClish of the complaint. The underlying conflict between the neighbors seems to have arisen over a property dispute. McClish believed that the neighbors had stolen part of his property, and a number of the incidents involving threats or profanity shouted across the property line seem to have occurred when Michael Padzur was clearing brush from the disputed area.

Holmberg met the deputies partway between the property line and his home, and McClish arrived home shortly thereafter. McClish reacted angrily to the presence of the deputies on his property. According to Terry, McClish said, "[T]he sheriff's office is a bunch of Nazis . . . . This is America. A man can have rights on his own property." Terry Crim. Depo. 19. After a conversation that Deputy Groves concluded "wasn't heading anywhere," the deputies crossed back over the property line to the Padzur residence.[1]

The Padzurs described for the deputies a litany of abuse allegedly suffered at

---

[1] In the pleadings below, appellants alleged that Deputy Terry became hostile when asked to leave the property, making verbal threats and refusing to leave until Deputy Groves persuaded him to walk away. Plaintiff's Statement of Material Fact ¶ 13 (citing Terry Civil Depo. 37-38). Terry's civil deposition transcript makes no reference to this.

the hands of Holmberg and McClish, including threats to kill members of the family, epithets ("Fucking white trash"), and firing guns into the air along the property line. The Padzurs complained that the Sheriff's Office had failed to respond to multiple requests for help and that they feared for their safety. Statements taken from various members of the Padzur family included remarks such as "Ed [Holmberg] and Doug [McClish] are getting more violent in their actions and words," "Doug said he wanted to kill us," and "I also think that [Doug] stalks us because at night he drives by are [sic] house at night real slow on his golf cart and stares . . . ." McClish denied making any threats towards the family and denied that he or Holmberg ever fired a weapon to harass the Padzurs.

As the deputies spoke with the Padzurs outside the Padzur home, McClish intermittently observed the interaction from his home. At some point during the interview, McClish got in his car, drove past the Padzur property, and yelled something out the window of his car. Deputy Terry claimed that McClish shouted, "I'm going to kill you, bitch. You'll see, bitch." Terry Aff. ¶ 13. McClish flatly denied this. Rather, McClish said that he yelled, "If they're telling you some more lies about us, forget it. She's a liar," McClish Aff. ¶ 7, and that this comment was directed at the officers, not at Mrs. Padzur, McClish Depo. 109. Deputy Groves testified only that McClish "yelled something from his vehicle," and said that he

4

did not observe McClish commit any crimes while the officers were present. Groves Depo. 15.

Upon returning to the Sheriff's Office, Deputy Terry reviewed the records of previous calls to the Sheriff's Office and concluded -- on the basis of his conversation with the neighbors and his personal observations of McClish's behavior -- that he had probable cause to arrest McClish[2] for the crime of aggravated stalking.[3] Although Terry decided to arrest McClish before returning to McClish's home, he did not attempt to obtain an arrest warrant from a magistrate during the six or seven hours separating the two visits,[4] and he conceded that there

---

[2] The fact that Terry had "observed some of Mr. McClish's behavior firsthand" "tipped" him towards seeking to arrest McClish rather than Holmberg. Terry Civil Depo. 55. At the end of the investigation, Terry thought that he "probably" could have arrested Holmberg for aggravated stalking, too. Id. McClish does not contest the district court's determination that probable cause existed for his arrest. Because the district court disposed of Holmberg's claim under Heck v. Humphrey, as discussed infra, the court did not make a finding as to whether there was probable cause to arrest Holmberg.

[3] The Offense Report filed by Deputy Terry refers to the offense of aggravated stalking under Florida Statutes section 784.048(3). This section provides:

> Any person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person, and makes a credible threat with the intent to place that person in reasonable fear of death or bodily injury of the person, or the person's child, sibling, spouse, parent, or dependent, commits the offense of aggravated stalking, a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

[4] The timing of events is not entirely clear from the record. In his 2002 deposition, Terry testified that he returned to the Padzur home at 8:00 p.m. Terry Crim. Depo. 38–39. In 2005, Terry also testified that he returned at 8:00 p.m. Terry Civil Depo. 51. Terry's affidavit, by contrast, makes no mention of an 8:00 p.m. visit to the property. It is undisputed, however, that the actual arrest took place shortly before midnight.

were no exigent circumstances to justify a warrantless entry into McClish's home.[5]

Deputy Terry and Deputy Calderone returned to the area at approximately 11:30 p.m. that same day to arrest McClish. They were accompanied by Deputy Martinez, a K-9 handler, and his dog, Magnum. Terry met briefly with the Padzurs to inform them of his intention to arrest McClish before he proceeded to the McClish/Holmberg property. Vehicular access to the McClish/Holmberg home is limited by an electronic gate posted with "No Trespassing" signs. McClish and Holmberg had given their neighbor Lanny Baum a "clicker" for the gate, which Baum was permitted to use in order to make periodic deliveries of fill dirt onto the Holmberg/McClish property. According to McClish, Baum had express instructions never to give the clicker to anyone else. On the night of the arrest, Baum either opened the gate for the deputies or loaned the device to Deputy Terry.

---

[5] During his 2005 deposition, Deputy Terry testified in this way:

Q:  Now, when you came back at 11:30, did you have a warrant?
A:  No.
Q:  Had you applied for a warrant?
A:  No.
Q:  And there was no exigency?
A:  No.
Q:  And you weren't in hot pursuit?
A:  That's correct.
Q:  Did you know you were going onto the residence of Mr. McClish and Mr. Holmberg?
A:  Yes, I did.

Terry Civil Depo. 54–55.

Shortly before midnight, the deputies drove through the gate to the McClish/ Holmberg home. Deputies Terry and Calderone climbed several steps leading to the screened-in porch at the front of the trailer. Deputy Martinez, the K-9 officer, hung back with the dog. Terry and Calderone entered the screened porch through a sliding screen door[6] and proceeded to the front door of the home.

Deputy Terry knocked on the door to the trailer, and at this point the accounts diverge sharply. As the district court characterized the deputies' version of McClish's arrest:

> Deputy Terry and Deputy Calderone went to the McClish and Holmberg residence to effectuate the arrest of McClish. . . . Deputy Terry . . . states that he walked onto the front porch and knocked on the front door. McClish opened the door and asked who it was, and Deputy Terry told him that it was the Sheriff's Office. McClish came out onto the porch and Deputy Terry then placed him under arrest.

Dist. Ct. Order at 5 (emphasis added, citations omitted).

McClish, in contrast, said that he had just gotten out of the shower when he heard a dog barking followed by a knock at the door. He put on a bathrobe, went to the door, and opened it.[7] McClish averred that Deputy Terry was standing on the

---

[6] Both Holmberg and McClish claimed that the sliding door leading onto the porch was never left open. McClish Depo. 98. Terry's affidavit, by contrast, described this sliding screen door as being "partially open." Terry Aff. ¶ 16. Although the legality of the officers' entry onto the porch was argued in the district court, this issue was not raised on appeal and, in light of our holding today, does not need to be addressed.

[7] It is unclear from the record whether McClish knew at the time that he opened the door that deputies from the Sheriff's Office were standing outside. Compare McClish Aff. ¶ 8 (stating

porch, directly in front of the open door,[8] and that Terry then reached into the house, grabbed him, and forcibly pulled him out onto the porch. Both Holmberg and McClish unambiguously stated that McClish had been standing completely inside the home at the time.

McClish recounted that after Deputy Terry pulled him out of the trailer, the deputy pushed him down onto a table on the porch and yanked his hands behind his back "quite forcibly." According to Terry, McClish requested and was denied the opportunity to dress. Terry stated that Holmberg's exit from the home during McClish's arrest prevented him from granting McClish's request to dress, and that he told McClish the county jail would provide clothing. McClish said that Terry then spun him around so that the two men were face-to-face and said, "Remember me?"

After McClish had been handcuffed and was being taken away, Holmberg came outside the home and was subsequently arrested for resisting an officer

---

that McClish opened the door following the knock), with McClish Depo. 118–119 (stating that McClish asked who was there and was told that it was the Sheriff's Office before opening the door).

[8] The McClish/Holmberg home apparently has both a wooden door and a screen door separating the interior of the home from the screened-in porch. See Holmberg Depo. 63. Aside from Holmberg's statement that the screen door between the porch and the interior was never left open, id., however, the record on appeal does not make clear who opened this screen door or at what point during the encounter it was opened. This fact was not argued on appeal, nor is it of any moment given our resolution of the case.

without violence. Again, the accounts differ. Holmberg claimed that he came out of the home as the deputies were leading McClish to the car and asked McClish what he should do. McClish told him to call a neighbor, Virginia Knight, for help in finding a lawyer. Holmberg added that he had turned around to return to the home and make the call when Deputy Terry told Deputy Calderone to arrest him. Terry and Calderone, by contrast, claim that Holmberg rushed out of the house yelling and screaming, and that he approached them with clenched fists. Deputy Calderone claims that he arrested Holmberg for resisting an officer without violence only after Holmberg refused several requests to walk away.

The two men were then taken to the county jail.[9] Holmberg said that he was sprayed with mace on two occasions, resulting in lasting damage to his eyes, and that he was taunted and baited with a camcorder. McClish recounted that he contracted bronchitis from sitting for hours in a cold cell without any clothes. McClish also claimed, at a deposition taken some four years after the arrest, that he still had scars from injuries suffered during the arrest. Finally, McClish said that the handcuffs were applied too tightly, damaging his wrists and causing him to partially lose function in both hands. McClish's hands and wrists were examined by a doctor, but the study was discontinued because McClish "could not tolerate"

---

[9] The Hernando County Jail is privately operated by the Corrections Corporation of America, not by the Hernando County Sheriff. Terry Aff. ¶ 18.

9

the tests. At the time of the arrest, McClish was 75 years old.

The charge against McClish was later dismissed. Holmberg entered into pretrial intervention, completed the program, and the charge against him was also dismissed.

On December 17, 2004, Holmberg and McClish sued Hernando County Sheriff Richard Nugent, Deputy Shawn Terry, and Deputy Christopher Calderone in the United States District Court for the Middle District of Florida. The amended complaint contained four counts. In Count I, McClish and Holmberg sued Sheriff Nugent for state law false arrest and battery. In Count II, McClish charged Deputy Terry, in his individual capacity, with malicious prosecution, again under state law. Count III contained McClish's § 1983 claims against Deputy Terry in his individual capacity for unreasonable warrantless arrest under the Fourth Amendment, harassment, arrest without probable cause, and causing his prosecution upon knowingly false testimony in the preparation of the arrest affidavit. Finally, in Count IV, Holmberg brought a § 1983 claim against Deputies Terry and Calderone alleging harassment, arrest without probable cause, and knowingly using false testimony in the preparation of the arrest affidavit.

Thereafter, Appellees moved for summary judgment, and on January 20, 2006, the district court entered final summary judgment for Deputy Sheriffs

Calderone and Terry on Counts II, III, and IV. The district court also dismissed without prejudice appellants' state law claims against Sheriff Nugent in Count I. McClish and Holmberg have timely appealed from the order of summary judgment entered on Counts III and IV and the dismissal of the state law claims in Count I under 28 U.S.C. § 1367(c)(3). (The appellants have not appealed from the entry of final summary judgment on Count II -- the state law malicious prosecution claim.)

## II.

We begin with McClish's appeal from the district court's order of summary judgment for Deputy Terry on qualified immunity grounds. The purpose of qualified immunity is "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Qualified immunity is an immunity from suit rather than a mere defense from liability. In order to spare officials who are entitled to immunity from the burden of litigation, the availability of qualified immunity should be evaluated early in the proceedings. Saucier v. Katz, 533 U.S. 194, 200–01 (2001). An official seeking qualified immunity must initially establish that he was acting within his discretionary authority. If the official was acting within the scope of his discretionary authority, the burden shifts

11

to the plaintiff.

First, the plaintiff must establish that the defendant's conduct has violated a constitutional right. Id. at 201. In evaluating the claimed violation, the court is obliged to review the facts in the light most favorable to the plaintiff. Id. Moreover, the constitutionality of the alleged violation is evaluated using present-day law. Then, the plaintiff must show that the violation was "clearly established." Id. We have held that decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law. See Marsh v. Butler County, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc). The law clearly establishing the violation also must be "pre-existing" -- that is, in effect at the time of the alleged violation. This requirement ensures that officers will not be liable for damages unless they had "fair warning" that their conduct violated the law. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

McClish does not dispute that Deputy Terry was acting within his discretionary authority at the time of the arrest, so McClish bore the burden of showing that Terry violated a clearly established statutory or constitutional right to overcome the qualified immunity defense. The district court did not determine the constitutionality of Deputy Terry's actions in arresting McClish. Instead, the court

12

avoided answering whether the arrest violated the Fourth Amendment by assuming that it did. The court then disposed of the case on the ground that the law was not clearly established. See Dist. Ct. Order at 12 ("Even if Deputy Terry violated a constitutional right by reaching across the doorway to arrest McClish, the state of the law as to doorway arrests was not 'clearly established' at the time Deputy Terry made the arrest.").

However, as the Supreme Court has made abundantly clear, qualified immunity determinations may not be disposed of in this arguendo form, by first simply assuming the violation and then proceeding to address whether the law was clearly established at the time of the infraction. Saucier, 533 U.S. at 201. Although both qualified immunity inquiries are logically related, the two inquiries must be conducted in the proper order. We may not assume an answer to the first question in order to avoid difficult constitutional issues. The Supreme Court has explained the requirement in these clear terms:

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

13

Id.; see also Bunting v. Mellen, 541 U.S. 1019, 1022 (2004) (Scalia, J., dissenting from denial of certiorari) ("This Court has established a mandatory order of priority for resolution of the two standard issues that arise in damages suits brought against government officers . . . ." (emphasis added)); Siegert v. Gilley, 500 U.S. 226, 232 (1991) (holding that the appellate court should not have assumed, without deciding, the constitutional question and characterizing this question as a "necessary concomitant" to the second inquiry); Stanley v. City of Dalton, 219 F.3d 1280, 1285 (11th Cir. 2000) (quoting Siegert's "necessary concomitant" language); Crosby v. Paulk, 187 F.3d 1339, 1345 (11th Cir. 1999) (citing Siegert).

We begin, therefore, as we must, with the first qualified immunity inquiry: whether Deputy Terry violated McClish's Fourth Amendment rights during the arrest.

## A.

McClish claims that Deputy Terry violated the Fourth Amendment by entering McClish's home without a warrant to arrest him. The Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

14

An arrest is quintessentially a seizure of the person, and therefore subject to the Fourth Amendment's reasonableness requirement. <u>California v. Hodari D.</u>, 499 U.S. 621, 624 (1991). It is by now clear that an arrest conducted in a public place must be supported by probable cause, but it does not require a warrant. <u>United States v. Watson</u>, 423 U.S. 411, 417 & n.6 (1976). An arrest in the home, however, is plainly subject to the warrant requirement; probable cause alone is insufficient. <u>Payton v. New York</u>, 445 U.S. 573, 589–90 (1980). McClish does not contest on appeal that Deputy Terry had probable cause to arrest him. Instead, he argues that the arrest was unconstitutional because Terry was not armed with an arrest warrant when Terry pulled McClish from his home.

The warrant requirement was first applied to cover an arrest inside a suspect's home in <u>Payton</u>, where the Court struck down a New York statute that permitted police to enter a private residence without a warrant, using force if necessary, to make a felony arrest. In the first of two consolidated cases addressed in <u>Payton</u>, New York City detectives sought to arrest Theodore Payton in connection with the murder of a gas station manager two days earlier. <u>Id.</u> at 576–77 & n.5. The police went to Payton's apartment and, after their knocks went unanswered, used crowbars to break open the door. Although Payton was not present, the police found and seized from within the home a shell casing that was

15

later introduced at Payton's murder trial. Id. In the second case, New York City police officers went to the apartment of Obie Riddick to arrest him for armed robbery. The police knocked at the door, and Riddick's young son answered. Through the open door, police peered into the house and saw Riddick sitting in bed covered by a sheet. The police entered Riddick's apartment and arrested him, again without a warrant. Id. at 578.

In Payton, the Supreme Court unambiguously held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Id. at 576. Because the police seeking to arrest Payton and Riddick had entered the suspects' homes without a warrant, the entries were found to be unreasonable, and, therefore, unlawful. As the Court explained, an arrest warrant was required to enter the home because the evidentiary inferences used to justify this kind of governmental intrusion should be drawn by a "neutral and detached magistrate," not an officer "engaged in the often competitive enterprise of ferreting out crime." Id. at 586 n.24 (quoting Johnson v. United States, 445 U.S. 10, 13–14 (1948)).

In reaching this holding, the Court gave special attention to the respect traditionally accorded to the sanctity of the home, an interest "embedded in our traditions since the origins of the Republic." Id. at 601; see also Georgia v.

16

Randolph, 126 S. Ct. 1515, 1523–24 (2006):

> Since we hold to the centuries-old principle of respect for the privacy
> of the home, it is beyond dispute that the home is entitled to special
> protection as the center of the private lives of our people. We have,
> after all, lived our whole national history with an understanding of the
> ancient adage that a man's home is his castle to the point that the
> poorest man may in his cottage bid defiance to all the forces of the
> Crown.[10]

(citations and quotations omitted). The problem with a warrantless entry to arrest was found not only in the governmental intrusion on personal freedom necessarily involved in any arrest, but also because it involved an intrusion into the sanctity of the home. Payton, 445 U.S. at 587–89; see also United States v. Reed, 572 F.2d 412, 423 (2d Cir. 1978) (applying this principle, in language quoted with approval in Payton, to a woman arrested behind the threshold of her apartment after opening her door in response to a police knock).

The Court thus rejected the idea that an entry to arrest was somehow less intrusive than an entry to search, reasoning that both intrusions violate the sanctity of the home. Instead, "the critical point is that any differences in the intrusiveness

---

[10] This statement alludes to the oft-quoted excerpt from a 1763 speech by William Pitt:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It
> may be frail; its roof may shake; the wind may blow through it; the storm may
> enter; the rain may enter; but the King of England cannot enter -- all his force
> dares not cross the threshold of the ruined tenement!

Miller v. United States, 357 U.S. 301, 307 (1958).

17

of entries to search and entries to arrest are merely ones of degree rather than kind.

The two intrusions share this fundamental characteristic: <u>the breach of the entrance</u>

<u>to an individual's home</u>." <u>Payton</u>, 445 U.S. at 589 (emphases added); <u>see also</u>

<u>Minnesota v. Olson</u>, 495 U.S. 91, 95 (1990) ("The purpose of the [<u>Payton</u>] decision

was not to protect the person of the suspect but to protect his home from

entry . . . .").[11]

The Supreme Court proceeded to define the scope of the Fourth

Amendment's protection of the home in very explicit terms:

> The Fourth Amendment protects the individual's privacy in a variety of settings. <u>In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home</u> -- a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[at] the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." <u>Silverman v. United States</u>, 365 U.S. 505, 511. In terms that apply

---

[11] As the Court explained in <u>Kyllo v. United States</u>, 533 U.S. 27 (2001),

The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. . . . [F]or example, we [have] made clear that any physical invasion of the structure of the home, "<u>by even a fraction of an inch</u>," was too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, <u>all</u> details are intimate details, because the entire area is held safe from prying government eyes.

<u>Id.</u> at 37 (emphases added, citations and quotations omitted).

> equally to seizures of property and to seizures of persons, the <u>Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.</u>

<u>Payton</u>, 445 U.S. at 589–90 (emphases added, alterations in original).

Warrantless entry into the home is therefore unreasonable, subject only to a few "jealously and carefully drawn" exceptions. <u>Randolph</u>, 126 S. Ct. at 1520 (quoting <u>Jones v. United States</u>, 357 U.S. 493, 499 (1958)). Consent provides one exception to the warrant requirement. <u>See</u> <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990); <u>United States v. Edmondson</u>, 791 F.2d 1512, 1515 (11th Cir. 1986). A second exception to the warrant requirement is made for "exigent circumstances," or situations in which "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." <u>United States v. Burgos</u>, 720 F.2d 1520, 1526 (11th Cir. 1983). Thus, for example, the courts have upheld exigent circumstances entries to break up a violent fight, <u>Brigham City v. Stuart</u>, 126 S. Ct. 1943, 1949 (2006), to prevent the destruction of evidence, <u>United States v. Mikell</u>, 102 F.3d 470, 476 (11th Cir. 1996), to put out a fire in a burning building, <u>Michigan v. Tyler</u>, 436 U.S. 499, 509 (1978), to pursue a fleeing suspect, <u>United States v. Santana</u>, 427 U.S. 38, 42–43 (1976), to rescue a kidnapped infant, <u>United States v. Laboy</u>, 909 F.2d 581, 586 (1st Cir. 1990), and to attend to a stabbing victim, <u>United States v. Gillenwaters</u>, 890 F.2d 679, 682 (4th Cir. 1989).

Under either consent or exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified. See Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992).

McClish's arrest involved neither consent nor exigent circumstances. The record does not reveal that McClish consented, and we have held that "whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction entry into the home based upon inferred consent." United States v. Gonzalez, 71 F.3d 819, 830 (11th Cir. 1996) (emphasis added, alteration and quotation marks omitted); cf. Edmondson, 791 F.2d at 1515. This is not to say, of course, that a suspect may not surrender to the police -- "there is nothing in Payton that prohibits a person from surrendering to police at his doorway." United States v. Berkowitz, 927 F.2d 1376, 1386 (7th Cir. 1991). The problem in this case is that McClish did not surrender to the police, nor did he have the opportunity to do so. Rather, viewing the evidence in the light most favorable to McClish, he was pulled from within his home, without warning, as soon as the door was opened.

Neither were exigent circumstances present, as conceded and amply demonstrated by the fact that many hours passed between the initial contact and the arrest. Instead, this case presents a different question: whether Deputy Terry

20

violated McClish's Fourth Amendment rights by reaching through McClish's open doorway to effect the arrest when McClish was standing near the doorway but fully within the confines of his home.

For purposes of this analysis, we are obliged to review the facts in the light most favorable to McClish, and therefore credit his claim that he stood firmly within his home but within reach of the open doorway at the time of the arrest. As McClish explained in his affidavit:

> [S]hortly before midnight I heard a loud knock on the door. I opened the door. Deputy Terry and Deputy Calderon were on the porch. Deputy Terry grabbed my arm, pulled me out on the porch, threw me down over a table and handcuffed me. Prior to being pulled out onto the porch, I was totally inside my house.

McClish Aff. ¶ 8 (emphasis added). Holmberg, who was standing in the living room of the trailer, testified that he saw "Officer Terry yank[] Mr. McClish from the front door." Holmberg Depo. 62. Holmberg specifically said that, immediately prior to the arrest, McClish was standing "inside the door of the house, the front door of the house." When asked whether "both feet [were] inside the house," Holmberg responded, "Yes." Id.

In Payton, the Supreme Court drew a "firm line" at the threshold of the home, explicitly observing that this "threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590. The Court could not have more

21

clearly defined the breadth of the Fourth Amendment's protection against warrantless in-home arrests -- it created a firm line delimiting a zone of privacy defined by "the unambiguous physical dimensions of an individual's home." Id. at 589. Although Deputy Terry may have only briefly intruded into the home, McClish's location at the time of the arrest -- firmly standing within his living room, completely behind the threshold -- means that Deputy Terry crossed Payton's firm line. The Fourth Amendment, as interpreted by Payton and its progeny, does not permit an officer to cross this constitutional line and forcibly remove a citizen from his home absent an exigency or consent.[12]

While the plain language of the Payton decision itself virtually compels this

---

[12] Application of this rule does not, as the special concurrence suggests, amount to a return to some outmoded, pre-Katz Fourth Amendment analysis based on property law and trespass. Physical boundaries still have relevance to Fourth Amendment analysis, as the Supreme Court has repeatedly said. See Soldal v. Cook County, 506 U.S. 56, 64 (1992) (rejecting the proposition that "the Fourth Amendment is only marginally concerned with property rights"); Oliver v. United States, 466 U.S. 170, 183 (1984) ("The common law may guide consideration of what areas are protected by the Fourth Amendment by defining areas whose invasion by others is wrongful."); Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978) ("[B]y focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment."); Alderman v. United States, 394 U.S. 165, 180 (1969) ("Nor do we believe that Katz . . . was intended to withdraw any of the protection which the Amendment extends to the home . . . ."). The Fourth Amendment focuses on whether society is prepared to recognize an expectation of privacy as reasonable. Because property law helps define our social expectations, it should not come as a surprise that property law boundaries may coincide with those boundaries delimiting physical spaces that society is prepared to respect. See Georgia v. Randolph, 126 S. Ct. 1515, 1521 (2006) (referring to "the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property"); Rakas, 439 U.S. at 143 n.12.

conclusion, the Supreme Court has re-inked <u>Payton</u>'s firm line on numerous subsequent occasions. See, e.g., <u>Kirk v. Louisiana</u>, 536 U.S. 635, 636 (2002) (per curiam) ("[T]he 'firm line at the entrance to the house . . . may not reasonably be crossed without a warrant.'" (quoting <u>Payton</u>, 445 U.S. at 590)); <u>New York v. Harris</u>, 495 U.S. 14, 18 (1990) ("<u>Payton</u> nevertheless drew a line at the entrance to the home. This special solicitude was necessary because physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (quotation marks omitted)); <u>Steagald v. United States</u>, 451 U.S. 204, 212 (1981) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." (quotation marks omitted)).

And were these reiterations of <u>Payton</u>'s "firm line" language insufficient, the Court has said that <u>Payton</u> set forth a bright-line rule. As Justice Scalia, writing for the majority in <u>Kyllo v. United States</u>, 533 U.S. 27 (2001), observed:

> We have said that the Fourth Amendment draws a "firm line at the entrance to the house," <u>Payton</u>, 445 U.S. at 590. <u>That line, we think, must be not only firm, but also bright</u> . . . ."

<u>Id.</u> at 40 (emphasis added); <u>see also id.</u> ("[W]e [have] made clear that <u>any</u> physical invasion of the structure of the home, '<u>by even a fraction of an inch</u>' [is] too much." (emphases added) (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511

23

(1961))). In short, while the Fourth Amendment's reasonableness jurisprudence is often inconsistent with the pronouncement of bright-line rules, Ohio v. Robinette, 519 U.S. 33, 39 (1996), we have little doubt that Payton created one.

Our cases have similarly emphasized Payton's "firm line" and "threshold" language. In Knight v. Jacobson, 300 F.3d 1272 (11th Cir. 2002), for example, an officer asked the suspect to step outside his apartment and then arrested him. In holding that the arrest did not violate the Fourth Amendment, we applied Payton's firm line approach in literal and physical terms, not as some literary or metaphorical device. Writing for the panel, Judge Carnes observed:

> The rule of Payton is that there is "a firm line at the entrance to the house," and absent exigent circumstances "that threshold may not reasonably be crossed without a warrant." Officer Jacobson never crossed that threshold or went over the line at the entrance to the house. . . . Payton keeps the officer's body outside the threshold, not his voice. It does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant. In that situation, the officer never crosses "the firm line at the entrance to the house" which is where Payton drew the line.

Id. at 1277 (citation omitted); see also Bashir v. Rockdale County, 445 F.3d 1323, 1327–28 (11th Cir. 2006) (quoting Payton's "firm line" and "threshold" language) United States v. Santa, 236 F.3d 662, 675 (11th Cir. 2000) (same); United States v. Parr, 716 F.2d 796, 814 (11th Cir. 1983) (same). Indeed, we do not see how the language of Payton itself -- which defines the "zone of privacy" in concrete and

24

physical terms "bounded by the unambiguous physical dimensions of an individual's home" and attaching "firm[ly]" "at the entrance to the house," 445 U.S. at 589–90 -- can be read just as some rhetorical or linguistic flourish.

Appellees suggest, however, that the arrest was nonetheless justified under United States v. Santana, 427 U.S. 38 (1976), and that Santana, not Payton, controls. Although the issue is fairly debatable, we remain unpersuaded. To begin with, Santana, decided four years before Payton, is most often cited as a hot pursuit case. See, e.g., Brigham City v. Stuart, 126 S. Ct. 1943, 1947 (2006); Welsh v. Wisconsin, 466 U.S. 740, 750 (1984); Steagald, 451 U.S. at 221; Bashir, 445 F.3d at 1329–30; United States v. Ramos, 933 F.2d 968, 972 (11th Cir. 1991) (per curiam); United States v. Satterfield, 743 F.2d 827, 843 (11th Cir. 1984). But see Illinois v. McArthur, 531 U.S. 326, 335 (2001); United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002).

In Santana, the Philadelphia police sought to arrest "Mom" Santana following an undercover narcotics purchase conducted at Santana's residence. As the police drove up to the house, "[t]hey saw Santana standing in the doorway of the house with a brown paper bag in her hand." Santana, 427 U.S. at 40 (footnote omitted). The Court characterized Santana's position as "standing directly in the doorway -- one step forward would have put her outside, one step backward would

have put her in the vestibule of her residence." Id. at 40 n.1. The police drove to within 15 feet of where Santana was standing and got out of their van, shouting "police." As the officers approached the door, Santana retreated into the house. The officers chased her through the open door, causing packages of heroin to spill out of the paper bag she had been holding when they caught and arrested her in the vestibule. Id. at 40. She was not arrested in the doorway, but rather in the interior of the home.

The Court upheld the warrantless arrest of Santana in the vestibule of her home in a two-part holding. The first part concerned Santana's expectation of privacy under the Fourth Amendment, and the second addressed the permissibility of the subsequent police entry into the home. Justice Rehnquist, writing for the majority, put it this way regarding Santana's expectation of privacy:

> In United States v. Watson, 423 U.S. 411 (1976), we held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment. Thus the first question we must decide is whether, when the police first sought to arrest Santana, she was in a public place.

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). She was not merely visible to the public but

was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. <u>Hester v. United States</u>, 265 U.S. 57, 59 (1924). Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in <u>Watson</u>.

<u>Id.</u> at 42. As for the portion of <u>Santana</u> regarding the permissibility of the subsequent police entry into Santana's home, the Court stated:

> The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest. We hold that it could not. In <u>Warden v. Hayden</u>, 387 U.S. 294 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons. . . . The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house. Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence.

<u>Id.</u> at 42–43.

Santana is both factually and legally distinguishable from the instant case. As a factual matter, McClish was not "as exposed to public view, speech, hearing, and touch as if []he had been standing completely outside [his] house." Santana's "home" (actually a drug house) was on a public street in a major city in broad daylight; the police drove to within fifteen feet of her front door. <u>Id.</u> at 40. Moreover, Santana was not clearly inside her home. When the police pulled up to the house, one officer testified, as summarized by the Court, that Santana was

27

standing "directly in the doorway -- one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." Id. at 40 n.1. Notably, McClish, unlike Santana, did not have to take one step backwards in order to be firmly planted inside his home, a trailer without all of the amenities of a larger house, such as a definable chamber between the outer door and the interior of the dwelling. See also United States v. Quaempts, 411 F.3d 1046, 1048 (9th Cir. 2005) (holding that a man who lived in a small trailer and opened his door to police while remaining in bed did not abandon his expectation of privacy and noting that "[t]o extend the holding of [a Ninth Circuit case following Santana] beyond the threshold into the interior of the home would do violence to the principles laid down in Payton that established a zone of privacy inside the physical dimensions of one's home").

Santana, unlike McClish, was already standing "directly in the doorway" when the police arrived to arrest her, not as a result of the police knocking on her door. See Duncan v. Storie, 869 F.2d 1100, 1102 n.5 (8th Cir. 1989) ("In Santana . . . the suspect was not summoned to the door. In fact, she was already standing in the open doorway of her home when the police arrived and identified themselves."); see also United States v. Reed, 572 F.2d 412, 422–23 (2d Cir. 1978) (holding that a woman arrested when she opened her door to police was not in the

same position as Santana but rather inside her home, in a place protected by the Fourth Amendment). Moreover, Santana was using her home for the commercial purpose of narcotics sales. See Minnesota v. Carter, 525 U.S. 83, 90–91 (1998) (according significance to the fact that a residence had been used for drug sales and noting that property used for commercial purposes is treated differently under the Fourth Amendment). Finally, and notably, Santana retreated into her home while holding a brown paper bag that turned out to be filled with drugs, and she held $70 in marked bills given her just minutes before during a controlled drug transaction with a police informant -- both facts the Court found significant. See Santana, 427 U.S. at 43 ("Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence."); see also id. at 44 (Stevens, J., concurring) ("The decision [to enter] was justified by the significant risk that the marked money would no longer be in Santana's possession if the police waited until a warrant could be obtained.").

Here, McClish was standing firmly inside the living room of his home -- a trailer located in a rural area, down a dirt road and behind an electric gate. McClish and Holmberg receive few, if any, visits from members of the public,[13] and we feel

---

[13] Consider the following exchange from McClish's deposition:

Q:     When somebody comes to visit you, --
A:     That does not happen.

29

quite safe in concluding that few members of the public would borrow a gate

opener from a neighbor, drive down the dirt road past the "no trespassing" signs,

and enter the screened porch attached to the home -- all after 11:30 at night.

Applying the Santana analysis, McClish was not in a public place. In sharp contrast

to the marked bills and drugs found in Santana, there were no exigent

circumstances here -- no retreat; no hot pursuit; no concerns with spoilation of

evidence, because the alleged crime was not of the type generally involving

physical evidence or contraband; and no hint of any threat to officer safety from an

unarmed, 75-year old man opening the door in his bathrobe at 11:30 p.m. Indeed,

the operative facts of this case established that the police had an extended period of

time within which to obtain a warrant from a neutral and detached magistrate.

Santana also differs from the present case as a matter of law. In the first

place, Santana did not resolve whether entry into the home for purposes of an

arrest was permissible without a warrant in the absence of an exigency such as hot

pursuit. In fact, Payton expressly referenced Santana in a list of cases noting that

the question had not been decided. See Payton, 445 U.S. at 574–575 & n.1 ("The

---

Q:      - - do they knock on the front door?
A:      That does not happen, sir.
Q:      Okay. But if they were to come, they would knock on the front door to tell
        you that they're there?
A:      I assume.

McClish Depo. 98.

30

important constitutional question presented by this challenge has been expressly

left open in a number of our prior opinions.").[14] Second, the police entry into and

arrest of Santana within the vestibule of her home, an area the Court recognized as

a private place,[15] was permitted on hot pursuit grounds -- not on the basis that she

had no expectation of privacy in the vestibule. Santana, 427 U.S. at 43; see also

Duncan, 869 F.2d at 1102 n.5 ("It was, however, the existence of exigent

circumstances [in Santana] -- a true hot pursuit -- that permitted the officers to

pursue the suspect inside her house." (quotation marks omitted)).

Moreover, to the extent that Santana is read as allowing physical entry past

Payton's firm line, bounded by the "unambiguous physical dimensions of the

_____

[14] Before Payton, the Court had previously intimated that warrantless in-home arrests were unconstitutional, but it had purposely and explicitly reserved the question in a series of cases dating back more than two decades. See. e.g., United States v. Watson, 423 U.S. 411, 418 n.6 (1976) (noting that Watson's midday public arrest did not present the "still unsettled question . . . whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest" (internal quotation marks omitted)); Santana, 427 U.S. at 45 (Marshall, J., dissenting) ("The Court declines today to settle the oft-reserved question of whether and under what circumstances a police officer may enter the home of a suspect in order to make a warrantless arrest."); Gerstein v. Pugh, 420 U.S. 103, 113 n.13 (1975) ("The issue of warrantless arrest that has generated the most controversy, and that remains unsettled, is whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest."); see also Coolidge v. New Hampshire, 403 U.S. 443, 480 (1971); Jones v. United States, 357 U.S. 493, 499–500 (1958).

[15] In Santana, the officer followed Santana "through the open door, catching her in the vestibule." 427 U.S. at 40 (emphasis added). The Court's holding clearly acknowledged that this "vestibule" -- a "passage, hall, or chamber between the outer door and the interior of a building: a porch or entrance into a house," Webster's Third New International Dictionary 2547 (2002) -- was a private place. See Santana, 427 U.S. at 43 ("We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." (emphasis added)).

31

home," without a warrant or an exigency, this interpretation is inconsistent with Payton, the Court's subsequent cases, and our own binding precedent. See Kyllo v. United States, 533 U.S. 27, 40 (2001); Payton, 445 U.S. at 590; Bashir v. Rockdale County, 445 F.3d 1323, 1330 (11th Cir. 2006); Knight v. Jacobson, 300 F.3d 1272, 1277–78 (11th Cir. 2002); United States v. Santa, 236 F.3d 662, 675 (11th Cir. 2000); United States v. Parr, 716 F.2d 796, 814 (11th Cir. 1983); see also Loria v. Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002) ("No invasion of the sanctity of the home can be dismissed as de minimis."); id. at 1286 ("Payton did not draw the line one or two feet into the home; it drew the line at the home's entrance."); United States v. Berkowitz, 927 F.2d, 1376, 1388 (7th Cir. 1991) (same).[16]

This reading of Santana is also incorrect because, as the Seventh Circuit observed, it "equate[s] knowledge (what the officer obtains from the plain view) with a right to enter, and by doing so permit[s] the rule of Payton to be evaded."

---

[16] We are aware that other courts grappling with the apparent tension between Santana and Payton have followed Santana's reasoning to the conclusion that a person opening the door in response to a knock from police has no reasonable expectation of privacy. See, e.g., McKinnon v. Carr, 103 F.3d 934, 935 (10th Cir. 1996) (per curiam); United States v. Vaneaton, 49 F.3d 1423, 1426 (9th Cir. 1995); United States v. Carrion, 809 F.2d 1120, 1128–29 & n.9 (5th Cir. 1987). However, few, if any, of the cases cited by Appellees involved a situation where police physically entered the home before the arrest. In Vaneaton, for example, the Ninth Circuit specifically noted that the police "did not enter the house until they formally placed Vaneaton under arrest." 49 F.3d at 1427. In McKinnon, "[t]he officers did not inappropriately enter McKinnon's home." 103 F.3d at 936. Finally, in Carrion, "the arrest was effected before the agents entered [the suspect's] hotel room." 809 F.2d at 1128. Here, by contrast, Deputy Terry reached across the threshold of the home and grabbed McClish without warning.

Hadley v. Williams, 368 F.3d 747, 750 (7th Cir. 2004). It is surely true that an individual who opens the door to his home may provide an officer with a basis for finding probable cause. See United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) (holding that, when officers suspicious of drug activity approached a house, knocked, and the door was opened, "[t]here is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana"). And, as in Tobin, the opening of the door may also give rise to exigent circumstances. See id. at 1511–12 (holding that an exigency was created when the officer at the opened door smelled marijuana and the suspect would have been aware of the officer's suspicions); see also United States v. Poe, 462 F.3d 997, 1001 (8th Cir. 2006) (finding that the seizure of a firearm exposed in plain view after the suspect opened the door was justified by the exigent circumstance of officer safety). Again, in this case, notwithstanding the suggestion found in the special concurring opinion, post at 64-66, there is not the slightest indication that the officers perceived that the 75-year-old McClish, dressed only in a bathrobe, posed any threat to the officer's safety.

Thus, although an individual who opens the door may provide an officer with more information than a person who chooses to remain behind a closed

33

door -- and, therefore, may well provide an officer with a basis for finding probable cause or an exigency -- this is quite distinct from creating, all in itself, a right of entry to seize a person from his home without a warrant. McClish did not completely surrender or forfeit every reasonable expectation of privacy when he opened the door, including, most notably, the right to be secure within his home from a warrantless arrest. See Hadley, 368 F.3d at 750 ("The fact that a person answers a knock at the door doesn't mean he agrees to let the person who knocked enter."); Berkowitz, 927 F.2d at 1387 ("Answering a knock at the door is not an invitation to come in the house."); United States v. McCraw, 920 F.2d 224, 228 (4th Cir. 1990) ("We hold that a person does not surrender his expectation of privacy nor consent to the officers' entry by [opening the door], and that his arrest inside his room under such circumstances is contrary to the fourth amendment and . . . Payton."); Duncan v. Storie, 869 F.2d 1100, 1103 (8th Cir. 1989); cf. Horton v. California, 496 U.S. 128, 137 & n.7 (1990). Simply put, the fact that an officer may view a subject in the interior of a home through an open door does not alter the basic rule that a warrantless entry into the home to effect an arrest is prohibited absent consent or exigent circumstances. Payton itself could not have made this point any clearer in the case of Riddick, who was seen in bed by the police who peered inside when Riddick's son voluntarily opened the door. Payton v. New

34

York, 445 U.S. 573, 579 (1980).

In sum, Payton, decided four years after Santana, set forth a bright-line rule: warrantless intrusions beyond the "zone of privacy" delimited by the threshold are presumptively unreasonable. Because Deputy Terry crossed Payton's firm line and physically hauled McClish out of his home, the arrest was unlawful. The fact that McClish opened the door does not vitiate the warrant requirement when, as here, McClish remained entirely within the home. McClish neither consented to the arrest (indeed, by his account, he was not given the opportunity to consent), nor were there exigent circumstances involved. In the absence of a warrant, McClish's arrest was, therefore, presumptively unreasonable and in violation of his Fourth Amendment right to be secure in his home.

B.

Having determined that Terry violated McClish's Fourth Amendment rights during the warrantless arrest, however, we must still answer whether the violation was so clearly established that Terry should be stripped of the qualified immunity customarily granted law enforcement officers engaged in the discretionary performance of their official duties. The critical inquiry is whether the law provided Deputy Terry with "fair warning" that his conduct violated the Fourth

35

Amendment. Hope v. Pelzer, 536 U.S. 730, 741 (2002). We think the answer is no -- the law did not provide the deputy with fair notice when the arrest occurred.

Although exact factual identity with a previously decided case is not required, the conduct must have been clearly unlawful in light of pre-existing law. See Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) ("[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." (quoting Hope, 536 U.S. at 741 (first alteration added)); see also Saucier v. Katz, 533 U.S. 194, 205 (2001) (noting that a motivating concern of this immunity inquiry is to "acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct"). As the Supreme Court recently held, qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

Were it not for United States v. Santana, 427 U.S. 38 (1976), this might have been a different case. See United States v. Newbern, 731 F.2d 744, 748 (11th Cir. 1984) ("The law is clear that law enforcement officers are prohibited from making a warrantless and nonconsensual entry into a suspect's home in order to make a felony arrest."); see also Bashir v. Rockdale County, 445 F.3d 1323, 1331 (11th

36

Cir. 2006) (holding, with regard to an arrest effected ten days before McClish's arrest, that Payton "sets forth the law with obvious clarity" (quotation marks omitted)). In light of Santana, however, and since McClish was standing within arm's reach of an officer at the front door, we cannot say that the illegality of McClish's arrest was clearly established at the time of the arrest.

No Supreme Court, Eleventh Circuit, or Supreme Court of Florida cases have resolved the question whether Payton or Santana applies to the arrest of a person who, while standing firmly inside the house, opens the door in response to a knock from the police and is then pulled outside the unambiguous physical dimensions of the home.[17] However, the law of other circuits might have permitted

---

[17] Only the Supreme Court of Florida has provided any substantive discussion of the relation between the two cases. In Byrd v. Florida, 481 So. 2d 468 (Fla. 1985), the court began by noting the difficulty of deciding whether Payton applied to the warrantless arrest of a person standing "at or just within" a residence:

> There is no question that if appellant had been asked to step outside and had complied, the warrantless arrest outside the room would have been proper and Payton would not apply. A significant question arises, however, when a warrantless arrest occurs at or just within the threshold of a residence.

Id. at 472. The court proceeded to decide the case on the ground that the police entry was consented to by the arrestee, holding that the suspect "consented to the law enforcement officers' entry into the threshold area by voluntarily opening the door, stepping back, and standing in the threshold after knowing who was present." Id. As Appellants argue, Byrd is undeniably a consent case. However, it is worth observing that the Supreme Court of Florida did go on to discuss cases involving nonconsensual arrests made under circumstances similar to McClish's arrest:

> There is also a line of cases which have held, in situations analogous to that presented here, that an arrest at or in the threshold of a residence does not involve an entry and, therefore, does not implicate Payton considerations. These cases

an arrest under facts similar to those presented here. See, e.g., United States v. Vaneaton, 49 F.3d 1423, 1426–27 (9th Cir. 1995); United States v. Carrion, 809 F.2d 1120, 1127–28 (5th Cir. 1987). These decisions from other circuits are not, of course, determinative of whether existing law in this Circuit was clearly established. Instead, they are simply further support for our conclusion: that in light of the apparent tension between Santana and Payton, we have no basis upon which to conclude that a reasonable law enforcement officer fairly would have known that the arrest alleged by McClish, within the house yet within reach of an officer standing outside, was unlawful. In short, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." Wilson v. Layne, 526 U.S. 603, 618 (1999).

While we believe that the better answer to the first question is that Deputy Terry's conduct was a violation of the Fourth Amendment, we are constrained to conclude that the unlawfulness of his conduct was not so clearly established as to justify stripping him of qualified immunity. Although we conclude that Payton set forth a bright line rule, Appellants have failed to meet their burden of

---

have characterized the threshold area as a public place wherein a warrant is not required to effectuate a valid arrest.

Id. (citing United States v. Santana, 427 U.S. 38 (1976); United States v. Mason, 661 F.2d 45 (5th Cir. Nov. 1981); United States v. Botero, 589 F.2d 430 (9th Cir. 1978); and a number of non-Florida state supreme court cases).

38

demonstrating that the law was clearly established in 2001 because they have failed to demonstrate, in light of Santana, that a reasonable officer would have clearly known that McClish's arrest was unlawful. If the role of the "clearly established" prong of the qualified immunity inquiry is to "acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," Saucier, 533 U.S. at 205, the apparent tension between Santana and Payton requires such an honest acknowledgment here.

**III.**

In addition to McClish's § 1983 claim, his roommate Edmund Holmberg brought an independent § 1983 civil rights claim against Deputies Calderone and Terry alleging, among other things, arrest without probable cause and the knowing use of false testimony in the preparation of the arrest affidavit. Holmberg claims that the district court erred in finding that his § 1983 claim was barred under Heck v. Humphrey, 512 U.S. 477 (1994), because of his participation in Florida's pretrial intervention (PTI) program. As explained more fully below, we agree that Heck is inapplicable here and accordingly reverse the final order of summary judgment and remand Holmberg's § 1983 claim for further proceedings consistent with this opinion.

39

Heck involved the question whether a state prisoner could challenge the constitutionality of his criminal conviction in a civil suit for damages under § 1983. Id. at 478. The Court held that Heck's claim was not cognizable under § 1983 because of the conflict between his civil suit and his criminal conviction:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

Id. at 486–87 (footnote and citation omitted). This rule is designed, the Court observed, to avoid the problem inherent in two potentially conflicting resolutions arising out of the same set of events by foreclosing collateral attacks on convictions through the vehicle of a § 1983 suit. Id. at 484–86.

Heck articulated two different categories of cases where conflicts might arise. The primary category of cases barred by Heck involved suits seeking damages for allegedly unconstitutional conviction or imprisonment. However, the Court also noted that a second category of cases -- suits to recover damages "for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" -- raised similar conflicts. Id. at 486 & n.6; see also Edwards v.

40

Balisok, 520 U.S. 641, 645–46 (1997) (characterizing the first category as involving challenges to the judgment and the second as involving challenges to procedures that, if successful, would necessarily imply the invalidity of the judgment). In a footnote in Heck, the Court gave an example of a case precluded under the second category: an individual who is convicted and sentenced for the crime of resisting arrest and subsequently brings a § 1983 claim alleging that the officer violated the Fourth Amendment during her arrest. Id. at 486 n.6. Although this individual would not be directly seeking damages for her conviction, as in the first category, her conviction and her § 1983 claim would share a common element -- both require a determination of the lawfulness of her arrest.[18] More important, to succeed on her § 1983 claim, she would have to show that her arrest was unlawful, a showing in conflict with a criminal conviction that necessarily came to the opposite conclusion on the same issue. To avoid this conflict, the Court held that "a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful" is also not cognizable. Id. at 486 n.6.

---

[18] Assuming, as the Court did, that the offense of resisting arrest is defined as "intentionally preventing a peace officer from effecting a lawful arrest." Heck, 512 U.S. at 486 n.6.

Holmberg's § 1983 claim arose out of his arrest for allegedly interfering with the ongoing arrest of McClish by Deputies Terry and Calderone. The deputies arrested Holmberg for "resisting arrest without violence," see Fla. Stat. § 843.02, and the charge was eventually dismissed without prejudice pursuant to Florida's pretrial intervention program, see Fla. Stat. § 843.02. The district court determined that Heck barred Holmberg from bringing a § 1983 claim because of his participation in PTI. Although we have never determined that participation in PTI barred a subsequent § 1983 claim, the district court cited to Second, Third, and Fifth Circuit cases holding that a defendant's participation in PTI barred subsequent § 1983 claims. Dist. Ct. Order at 19–20 (citing Gilles v. Davis, 427 F.3d 197 (3d Cir. 2005); Taylor v. Gregg, 36 F.3d 453 (5th Cir. 1994); Roesch v. Otarola, 980 F.2d 850 (2d Cir. 1992)). The district court then concluded that "Holmberg's participation in PTI, which resulted in a dismissal of the charge of resisting arrest without violence, is not a termination in his favor, and therefore, he is barred from bringing a § 1983 claim for false arrest." We disagree.

Heck is inapposite. The issue is not, as the district court saw it, whether Holmberg's participation in PTI amounted to a favorable termination on the merits. Instead, the question is an antecedent one -- whether Heck applies at all since Holmberg was never convicted of any crime. The primary category of cases barred

42

by Heck -- suits seeking damages for an allegedly unconstitutional conviction or imprisonment -- is plainly inapplicable. Instead, the district court based its Heck ruling on the second, indirect category of cases barred by Heck: suits to recover damages "for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid." Heck, 512 U.S. at 486; see Dist. Ct. Order at 18. The problem with using this second Heck category to bar Holmberg's § 1983 suit is definitional -- to prevail in his § 1983 suit, Holmberg would not have to "negate an element of the offense of which he has been convicted," because he was never convicted of any offense. See Heck, 512 U.S. at 487 n.6; see also Wallace v. Kato, 127 S. Ct. 1091, 1097–98 (2007) (observing, in a different context, that Heck only comes into play when there has been an "outstanding criminal judgment" or "extant conviction," and that Heck was not raised when "there was in existence no criminal conviction that the cause of action would impugn").

The district court may have been correct that dismissal of the charge against Holmberg pursuant to PTI was not a favorable termination on the merits, but neither was it a conviction or sentence. Holmberg's § 1983 suit does not represent the sort of collateral attack foreclosed by Heck for the straightforward reason that it is not collateral to anything -- the § 1983/habeas conflict addressed in Heck is

nonexistent when, as here, there was never a conviction in the first place.[19] In short, to dismiss this § 1983 claim as barred by Heck because of a potential conflict that we know now with certainty will never materialize would stretch Heck beyond the limits of its reasoning. Cf. Wallace, 127 S. Ct. at 1098 (explaining that Heck does not bar "an action which would impugn an anticipated future conviction" and characterizing this theory as a "bizarre extension of Heck"). During oral argument, however, we asked whether probable cause to arrest Holmberg would, in any event, vitiate Holmberg's claims in whole or in part. See Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). But inasmuch as this issue was not addressed in the district court, we leave this too for the district court to examine on

---

[19] Even if we were to assume that Heck somehow applies to this case, Holmberg correctly cites to Abusaid v. Hillsborough County Board of County Commissioners, 405 F.3d 1298 (11th Cir. 2005), for the proposition that the Supreme Court has apparently receded from the idea that Heck's favorable-termination requirement also applies to non-incarcerated individuals. In Abusaid, we addressed the Court's holding in Spencer v. Kemna, 523 U.S. 1 (1998), and noted, in dicta, that Spencer indicated that a majority of the Court had "expressed the view that § 1983 claims are barred only when the alternative remedy of habeas relief is available." Abusaid, 405 F.3d at 1316 n.9 (citing the Spencer concurrence of Justice Souter, joined by Justices O'Connor, Ginsburg, and Breyer, along with the dissent of Justice Stevens).

The logic of our reasoning in Abusaid, although dicta, is clear: If Heck only bars § 1983 claims when the alternative remedy of habeas corpus is available, then Heck has no application to Holmberg's claim. Holmberg was never in custody at all, and the remedy of habeas corpus is not currently available to him. Even if the district court was correct in concluding that Florida law would permit a prosecutor to later "resurrect" a charge dismissed pursuant to PTI, a matter upon which we express no opinion, the statute of limitations for Holmberg's alleged violation is now long past. See Fla. Stat. § 843.02 (2006) (defining the offense of resisting an officer without violence as a first-degree misdemeanor); Fla. Stat. § 775.15(2)(c) (providing for a two-year statute of limitations for first-degree misdemeanors).

remand. Accordingly, we reverse the district court's determination that Holmberg's § 1983 claim was barred under Heck v. Humphrey and remand this claim for further proceedings.

After dismissing the federal claims, the district court also dismissed without prejudice the state law claims pursuant to 28 U.S.C. § 1367(c)(3), which provides that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." Having reversed the district court's grant of summary judgment entered in favor of Terry and Calderone as to Holmberg's § 1983 claim, however, we must also reverse this dismissal and remand the state law claims for further proceedings.

## IV.

In short, we affirm the district court's grant of summary judgment for Deputy Terry as to McClish's § 1983 claim on qualified immunity grounds, reverse the district court's grant of summary judgment for Deputies Terry and Calderone on the grounds that Holmberg's § 1983 claim was Heck-barred, reverse the district court's dismissal of Appellants' state law claims, and remand for further proceedings consistent with this opinion.

45

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.**

ANDERSON, Circuit Judge, concurring specially:

I concur in the result and agree with the opinion of the majority insofar as it determines that the Fourth Amendment right at issue was not clearly established, and insofar as it determines that Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994), does not bar Holmberg's suit. However, I respectfully disagree with the majority opinion insofar as it concludes that there has been a violation of McClish's Fourth Amendment rights.[1] This is an issue with which courts have struggled, and on which there is a split of authority.

In my judgment, the controlling case is United States v. Santana, 427 U.S. 38, 96 S. Ct. 2406 (1976). In Santana, police officers saw the suspect perched on

---

[1] Because we hold that the law was not clearly established at the time of the relevant conduct, it would not be necessary to address the constitutional issue in this case but for the Supreme Court's admonition in Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."). Unfortunately, in this case, because the defendants prevailed on the clearly established prong, the Saucier rule not only requires a constitutional holding that would be unnecessary otherwise; it also operates to insulate from further appellate review an erroneous constitutional ruling that will guide the conduct of police officers in three states. See Brosseau v. Haugen, 543 U.S. 194, 202, 125 S. Ct. 596, 601 (2004) (Breyer, J., joined by Scalia & Ginsburg, JJ., concurring). Also, under the Saucier approach, a court is handicapped in addressing the constitutional issue because at least one party often has little incentive to litigate the issue vigorously, especially when it is apparent that the law is not clearly established, as in this case. Similarly, only the Supreme Court's mandate provides an incentive for busy federal judges to focus intently on the issue; they lack the usual incentive that proper resolution of the matter will make a real difference to a real party. For these reasons and others, twenty-eight states and Puerto Rico have recently urged the Supreme Court in an amicus brief to reconsider its mandatory Saucier approach to qualified immunity. See Brief for 28 States and Puerto Rico as Amici Curiae in Support of Petitioner, Scott v. Harris, No. 05-1631 (Supreme Court, December 2006).

the threshold of her doorway, where "one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." Id. at 40 n.1, 96 S. Ct. at 2408 n.1. The Court, on its way to a hot pursuit holding, held that it would have been legal for the officers to arrest Santana in her initial position, even though they only had probable cause and had not obtained a warrant. The Court concluded that Santana was in a public place, which meant that no warrant would have been required, pursuant to United States v. Watson, 423 U.S. 411, 96 S. Ct. 820 (1976). The Court reasoned:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place. She was not in an area where she had any expectation of privacy. "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351, 88 S. Ct. 507, 511 (1967). She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. . . . Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function which we have approved in Watson.

Santana, 427 U.S. at 42, 96 S. Ct. at 2409.

The instant case is legally indistinguishable from Santana. When the police officers knocked, McClish voluntarily opened the door, thereby exposing the

48

doorway area to the view of the police.[2]  Then, under McClish's version of the

facts, the police officers reached in and grabbed him for the purpose of drawing

him onto the porch and arresting him.  Because the police officers only reached

across the plane of the door, it is clear that it was physically impossible for them to

see any more of the home than McClish allowed them to see when he opened the

door.  Like Santana, McClish "knowingly expose[d]" both himself and the

immediate area behind his threshold to public view.  McClish no longer had an

"expectation of privacy" that the officers could have violated.  He was therefore in

a "public" place, just as Santana was, and under Watson the police needed only

probable cause, and not a warrant, to arrest him.  The officers admittedly had

probable cause to arrest, so they did not violate McClish's rights under the Fourth

Amendment.

The majority opinion relies on Payton v. New York, 445 U.S. 573, 100 S.

Ct. 1371 (1980), to conclude that the police officers violated McClish's

constitutional rights because their arms passed the physical plane of the door to his

home, and a warrant would have been necessary to justify this intrusion.  Payton

---

[2] Viewing the facts in the light most favorable to McClish, no reasonable jury could conclude that the door was not opened voluntarily.  Under McClish's version of the facts, the officers knocked on the door; McClish asked who was there; the officers answered "Sheriff's Office"; and McClish opened the door and asked "What happened?" before being arrested.  There is no evidence of any show of force by the police that could have coerced McClish into opening the door, nor is there any evidence that McClish felt coerced.

held that officers must, absent exigent circumstances, obtain a warrant before they may enter a suspect's home to arrest that suspect. Id. at 590, 100 S. Ct. at 1382.

Payton, however, was not a doorway arrest case. The issue in Payton was simply "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." Id. at 575, 100 S. Ct. at 1374. The Court characterized this issue as "narrow." Id. at 582, 100 S. Ct. at 1378. And the facts in Payton involved officers penetrating well into the interior of a suspect's home, not simply reaching through an opened door. In Payton's case, officers knocked down the door and entered well into the interior of the dwelling. In the companion case of Riddick, the suspect's son answered the door, and in order to arrest the suspect, officers had to enter well into the interior of the home. The Court therefore did not have an occasion to express a holding on the doorway arrest scenario, which lies on the boundary between Payton and Watson.

Santana, on the other hand, was a doorway arrest case, and is the Supreme Court's last and only word on the Fourth Amendment rule at the opened door. It explicitly rejected a test at the threshold that would depend on the plane of the door. The Court said, "While it may be true that under the common law of property the threshold of one's dwelling is 'private,' as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth

Amendment Santana was in a 'public' place." Santana, 427 U.S. at 42, 96 S. Ct. at 2409. The Court, in stating its holding, specifically used the word "threshold"; acknowledged that the threshold was a significant property law concept; declined to accord that concept any significance in defining the scope of the warrant requirement; and, even though Santana's body was partially inside that property-law threshold, adopted an expectation-of-privacy test and held that the arrest would have been constitutional. Id. Santana therefore states the proper test at the voluntarily opened doorway.

Instead of following Santana's expectation of privacy holding, the majority opinion relies on language drawn from the Payton opinion that, in its view, adopted a plane-of-the-door rule at the opened doorway. See Payton, 445 U.S. at 589, 100 S. Ct. at 1381 ("[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the **breach of the entrance** to an individual's home.") (emphasis added); id. at 590, 100 S. Ct. at 1382 ("[T]he Fourth Amendment has drawn a **firm line at the entrance to the house**. Absent exigent circumstances, that **threshold may not reasonably be crossed** without a warrant.") (emphasis added).

This language from Payton did not overrule the clear holding in Santana.

51

The Court said nothing specific about arrests at the opened doorway, and did not

make any choice between a plane-of-the-door or an expectation-of-privacy rule.  In

fact, the language about threshold is best read as dicta.  Its rhetorical source is

William Pitt's famous quote about the home, cited in Payton:

> There can be no doubt that Pitt's address in the House of Commons in
>
> March 1763 echoed and re-echoed throughout the Colonies: "The
>
> poorest man may in his cottage bid defiance to all the forces of the
>
> Crown.  It may be frail; its roof may shake; the wind may blow
>
> through it; the storm may enter; the rain may enter; but the King of
>
> England cannot enter–all his force dares not **cross the threshold** of
>
> the ruined tenement!"

Payton, 445 U.S. at 601 n.54, 100 S. Ct. at 1388 n.54 (emphasis added).  Payton's

language about crossing the threshold seems to have been drawn directly from this

speech.  And neither Payton nor Pitt expressed an opinion on open doorway

arrests.[3]  Rather, they were using "crossing the threshold" to mean "entering the

---

[3] As Pitt was speaking at a debate about searches incident to the excise tax on cider, see Miller v. United States, 357 U.S. 301, 307, 78 S. Ct. 1190, 1195 (1958), he was not intending to make any nuanced legal point.  See Steagald v. United States, 451 U.S. 204, 229-30, 101 S. Ct. 1642, 1656 (1981) (Rehnquist, J., dissenting) (making the point that Pitt's statement was rhetoric, not legal opinion, and noting that "parliamentary speaking ability and analytical legal ability ought not to be equated with one another").

home." Both Pitt and Payton were engaging in the literary device of synecdoche, whereby a part of a thing is used to refer to the whole, as in the phrase "all hands on deck" to refer to "all sailors on deck." They both used "threshold" to refer in a rhetorical way to the "home."

Payton simply did not speak to the doorway arrest scenario, and the rhetorical use of the word "threshold" should not be relied upon as having decided the question of the appropriate test at the opened doorway. Payton nowhere opined about whether a plane-of-the-door or an expectation-of-privacy test governs at the opened doorway. The Payton holding is thus essentially neutral with respect to the proper rule for doorway arrests. Santana, on the other hand, explicitly rejected a property law, plane-of-the-door rule, and said that a warrantless arrest is proper so long as the suspect has no expectation of privacy. It therefore contains the controlling principle of law in the doorway arrest situation.

In order to choose the dicta of Payton over the holding in Santana, the majority must and apparently does argue that Payton overruled Santana, or at least confined it to its specific facts.[4] This conclusion is unwarranted. In the first place,

_____

[4] The majority also characterizes Santana as a "hot pursuit" case. It is true that Santana's second holding, the hot pursuit holding, is the one more often cited. But that is simply a function of the relative frequency of litigated doorway arrest cases versus litigated hot pursuit cases. For example, it took more than thirty years for the doorway arrest scenario to be squarely presented to this Court. The Santana Court clearly considered the first holding to be a necessary one: it had to address the legality of the arrest because it established that the officers did not impermissibly create the hot pursuit exigency. See Santana, 427 U.S. at 42, 96 S. Ct. at 2409.

it is clear that Payton did not overrule Santana. The Court does not overrule precedents sub silentio. See Agostini v. Felton, 521 U.S. 203, 237, 117 S. Ct. 1997, 2017 (1997) ("We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Nor is it appropriate to read Payton as overruling Santana. At the time of Payton, Santana was only four years old, and postdated Watson, the seminal public arrest case, by a mere six months.

Moreover, in Payton the Court actually cited Santana, without overruling or even questioning it, in its string cite of prior cases dealing with "public" arrests. See Payton, 445 U.S. at 575 n.1, 100 S. Ct. at 1374 n.1. The Santana Court had been aware of the issue of warrantless in-home arrests: Justice White specially concurred to make it clear that he believed warrantless in-home arrests were constitutional as a general matter so long as officers had probable cause. See Santana, 427 U.S. at 43-44, 96 S. Ct. at 2410 (White, J., concurring). Despite this awareness of the home issue, Santana adopted an expectation-of-privacy test at the opened doorway. Yet Payton did not overrule Santana, and its arrest holding has never been questioned since. The best reading of this history is that Santana sets

54

forth the proper rule at the opened doorway.[5]

It is also clear that the reasoning of Payton did not implicitly undermine the Santana holding. The rationale for Payton was the protection of the privacy of the home. The Court concluded that, even though probable cause gives officers a right to arrest the suspect, the privacy of the home justifies the additional protection of the warrant in a home arrest situation. Payton, 445 U.S. at 588, 100 S. Ct. at 1381. As a result, the Payton opinion is suffused with privacy-protection reasoning. See id. ("an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the **privacy and the sanctity of the home**, and justify the same level of constitutional protection") (emphasis added); id. at 588 n.26, 100 S. Ct. at 1381 n.26 ("The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his **privacy**") (emphasis added); id. at 589, 100 S. Ct. at 1381 ("The Fourth Amendment protects the individual's **privacy** in a variety of settings. In none is the zone of **privacy** more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home–a zone that finds

_____

[5] The fact that the Court did not overrule Santana is itself reason enough to reject the majority opinion's rule. The Court in Santana said that arrests on the threshold without a warrant are legal. But common sense tells us that an officer conducting an arrest at the literal threshold would necessarily cross the plane of the door in a great many threshold arrests. The majority rule is thus facially inconsistent with Santana's holding, and in effect overrules a Supreme Court precedent on the basis of dicta in another Supreme Court opinion.

55

its roots in clear and specific constitutional terms.") (emphasis added); id. at 596, 100 S. Ct. at 1385 ("The common-law sources display a sensitivity to **privacy interests** that could not have been lost on the Framers.") (emphasis added).

The Santana rule is consistent with Payton's privacy-protection rationale. Santana simply says that when a suspect has voluntarily relinquished the privacy of the home in the doorway area, the Payton concern for the privacy of the home is not present and the public arrest rule of Watson applies. The suspect need not open the door. But if he chooses to do so, the officers do not offend the rationale of Payton by simply reaching in and grabbing him.[6]

---

[6] To a lesser extent, Payton relied on the status of warrantless in-home arrests under the common law. Watson, which established that warrantless public arrests are constitutional, relied in significant part on the common law's acceptance of such seizures. See Watson, 423 U.S. at 418, 96 S. Ct. at 825. Payton, on the other hand, concluded that the common law sources were at best equivocal as to the status of arrests without a warrant inside the home. Payton, 445 U.S. at 596-98, 100 S. Ct. at 1385-86. This was another reason, in addition to the special privacy of the home, for departing from the Watson rule.

The Supreme Court has recognized, however, that the common law generally permitted a warrantless arrest inside the home when the outer door was open. See Steagald v. United States, 451 U.S. 204, 217 n.11, 101 S. Ct. 1642, 1650 n.11 (1981) ("Under the common law, a privilege attaches to the outer door of a dwelling, because. . . it is the owner's castle. . . . Thus, an open outer door was apparently regarded as the equivalent of a consent of the occupant for the constable to enter the home and conduct a search.") (internal punctuation omitted). The common law sources appear to confirm the Court's statement. For example, Coke, who was interpreted in Payton as proscribing warrantless in-home arrests, appeared to accept such arrests where the door was open. See 4 E. Coke, Institutes *178 ("[I]f the door of the house be open, [the constable] may enter into the same, and arrest the party."). See also Semayne's Case, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1603) (cited in Payton, 445 U.S. at 592, 100 S. Ct. at 1383) ("That in all cases when the door is open, the sheriff may enter the house and do execution at the suit of any subject, either of the body or of the goods, and so may the lord in such case enter the house and distrain for his rent or service."); M. Foster, Crown Law 319-20 (1762); 4 W. Blackstone, Commentaries *289. Because the common law apparently permitted open door arrests without a warrant, Santana is as consistent with Payton's common-law rationale as it is

The majority opinion argues that the <u>Santana</u> approach erodes the protection of <u>Payton</u> because it allows officers to seize whatever they can see inside a home through an opened door. But the <u>Santana</u> approach does not extend that far. The <u>Santana</u> rule operates only insofar as the suspect voluntarily relinquishes some of the privacy of the home. In other words, the <u>Santana</u> rule subjects to seizure only what the officer can seize without seeing more of the home than was voluntarily exposed. Thus, the officer can seize the suspect who is within reach of the officer standing at the threshold because the officer does not thereby intrude further on the suspect's privacy than what the suspect had voluntarily relinquished. On the other hand, the officer who arrested Riddick in <u>Payton</u> could not reach Riddick while standing at the opened door. He walked past the opened door, into the house, thus intruding further upon privacy than the voluntary opening of the door exposed. From the interior of the house, where the officer seized Riddick, the officer could see details and areas of the house not voluntarily exposed by the opening of the front door. That was the constitutional violation in Riddick's case. <u>See also</u> <u>Kyllo v. United States</u>, 533 U.S. 27, 37, 121 S. Ct. 2038, 2045 (2001) ("In the home, our cases show, <u>all</u> details are intimate details, because the entire area is held safe from prying government eyes) (emphasis in original).

with <u>Payton</u>'s privacy-protection rationale.

57

The scope of <u>Santana</u> is thus consistent with Riddick's case and does not undermine the <u>Payton</u> rule, contrary to the majority's suggestion. In fact, by leaving the door closed, a suspect can always, in the absence of exigent circumstances or some other exception to the warrant requirement, force officers to obtain a warrant before entering the home to arrest. And by opening the door, the suspect loses the protection of the <u>Payton</u> rule only insofar as the officers can accomplish the arrest without seeing any detail that the suspect did not voluntarily expose.

Not only has <u>Santana</u> never been overruled or even questioned by the Supreme Court, and not only is it in harmony with the rationale of the <u>Payton</u> decision: it is also more consistent with Fourth Amendment jurisprudence in general than the majority opinion's approach. The majority opinion reads <u>Payton</u> to support a bright-line rule at the property-law plane of the opened door. But bright-line rules are generally disfavored under the Fourth Amendment's global command of "reasonableness." In <u>Ohio v. Robinette</u>, 519 U.S. 33, 117 S. Ct. 417 (1996), the Court said, "We have long held that the touchstone of the Fourth Amendment is reasonableness. Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances. In applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific

nature of the reasonableness inquiry." Id. at 39, 117 S. Ct. at 421 (citing Florida v. Bostick, 501 U.S. 429, 111 S. Ct. 2382 (1991); Michigan v. Chesternut, 486 U.S. 567, 108 S. Ct. 1975 (1988); Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319 (1983); and Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041 (1973)).

The disfavored status of bright-line rules in the Fourth Amendment area means that the Court never adopts such rules by implication or sub silentio. In every case where the Court has adopted a bright-line rule, the Court has taken great pains to justify why the normal presumption against such rules should be disregarded in the particular context. For example, in New York v. Belton, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864 (1981), the Court held that the entire interior of an automobile is within the grab area of an arrestee for purposes of the Chimel search-incident-to-arrest rule. The Court explicitly discussed why other more nuanced rules were unworkable, and ultimately decided in no uncertain terms "to establish the workable rule this category of cases requires." Id. See also Oliver v. United States, 466 U.S. 170, 181-82, 104 S. Ct. 1735, 1743 (1984) (explicitly justifying bright-line rule that open fields are not protected by Fourth Amendment); United States v. Robinson, 414 U.S. 218, 234-35, 94 S. Ct. 467, 476 (1973) (explicitly justifying search incident to arrest without regard to individualized assessment of dangerousness).

Payton, by contrast, contains no discussion at all of the bright-line-rule issue. It did not explicitly state that the law at the opened doorway would be governed by the plane of the door. Nor did it contain any reasoning to justify such a result. Rather, it simply contained the language about "entrance" and "threshold," which it used rhetorically to refer to "the home." Payton therefore cannot be read to establish a disfavored bright-line rule at the plane of the opened doorway, especially in light of Santana's countervailing holding that is directly on point.[7]

---

[7] The majority opinion not only asserts that Payton established a bright-line rule, but also argues that the line has been "re-inked" many times. But the cited cases all simply quoted the language of Payton on their way to holdings that did not involve a voluntarily opened door. In Kirk v. Louisiana, 536 U.S. 635, 636, 122 S. Ct. 2458, 2458 (2002), the officers entered well into the interior of the home, without the justification of exigent circumstances. In New York v. Harris, 495 U.S. 14, 15, 110 S. Ct. 1640, 1642 (1990), the suspect did not open the door voluntarily, as the police displayed their guns and badges to get the suspect to open the door. In Steagald v. United States, 451 U.S. 204, 101 S. Ct. 1642 (1981), the issue was whether police need a search warrant (in addition to an arrest warrant) to arrest a third party in someone else's home; the Court concluded that police do need a search warrant. But police intruded well inside the home, and the case merely repeated the rhetoric from Payton in a quotation, without expressing a view on the doorway arrest situation. Id. at 206, 101 S. Ct. at 1644.

The majority finds its strongest language in Kyllo v. United States, 533 U.S. 27, 121 S. Ct. 2038 (2001). But Kyllo involved neither a doorway nor an arrest. The majority opinion's quotes from Kyllo were also not talking about a bright line at the door. The first quote says that "the Fourth Amendment draws a firm line at the entrance to the house. . . . That line, we think, must be not only firm, but also bright–which requires clear specification of those methods of surveillance that require a warrant." Id. at 40, 121 S. Ct. at 2046. There the Court was not talking about a plane-of-the-door rule at the opened door, but rather was choosing the relatively bright-line, categorical test for when surveillance equipment can be used to observe a home. As in other Fourth Amendment bright-line-rule cases, the Court explicitly justified its bright-line rule.

The second quote is, "[W]e [have] made clear that any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." Id. at 37, 121 S. Ct. at 2045. Here too the Court was not ratifying a bright-line rule at the opened doorway, but rather responding to an argument

A plane-of-the-door rule is doubly disfavored because the Court does not ordinarily define Fourth Amendment protections by reference to property-law concepts. Since Katz v. United States, 389 U.S. 347, 88 S. Ct. 507 (1967), it has been clear that the Fourth Amendment protects privacy, not property. See id. at 353, 88 S. Ct. at 512 ("[T]he premise that property interests control the right of the Government to search and seize has been discredited. . . . [T]he reach of [the] Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure."). The warrant requirement too ordinarily serves to protect privacy. See Johnson v. United States, 333 U.S. 10, 14, 68 S. Ct. 367, 369 ("When the right of **privacy** must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement

---

by the government that only techniques that detect "private details" of home life are searches. The Court was making the point that any detail, even one a fraction of an inch inside the door, is considered private. The Court did not opine on what happens at the opened door, where the suspect voluntarily reveals some of those private details. Kyllo, like Payton, simply was not an opened doorway arrest case. And its rationale, like Payton's, does not apply where the suspect has voluntarily relinquished some of the privacy of the home.

The Eleventh Circuit cases cited in the constitutional section of the majority's opinion are also inapposite (as they must be, since we hold that the law was not clearly established in Florida at the time of the relevant conduct). See Bashir v. Rockdale County, 445 F.3d 1323, 1326 (11th Cir. 2006) (suspect entered home without inviting police, police followed him inside, penetrating well into interior before arresting); Knight v. Jacobson, 300 F.3d 1272, 1277-78 (11th Cir. 2002) (arrest took place after suspect left the home, therefore Payton did not apply); United States v. Santa, 236 F.3d 662, 666 (11th Cir. 2000) (officers entered well into interior of home without warrant, no exigent circumstances); United States v. Parr, 716 F.2d 796, 814 (11th Cir. 1983) (no exigent circumstances where firefighter intruded well inside home). These cases simply repeated the Payton dicta as a figurative or shorthand way of referring to "the home." Just as the Payton Court did.

agent.") (emphasis added). Payton was well within this tradition when it relied on the special privacy of the home to justify a warrant requirement for arrests inside the home. Santana was also within this tradition when it held that an arrest was "public" where the suspect had relinquished that expectation of privacy.

But it would be inconsistent with these cases to extend Payton to cases where privacy is not implicated, simply because the officer crossed the property-law plane of the door. The Court has eschewed such a property-based approach. See, e.g., Oliver v. United States, 466 U.S. 170, 183-84, 104 S. Ct. 1735, 1743-44 (1984); Frazier v. Cupp, 394 U.S. 731, 740, 89 S. Ct. 1420, 1425 (1969). Moreover, it has avoided relying on property law concepts even when analyzing cases that involve the home. See, e.g., Kyllo v. United States, 533 U.S. 27, 32, 121 S. Ct. 2038, 2042 (2001) ("We have. . . decoupled violation of a person's Fourth Amendment rights from trespassory violations of his property"); United States v. Karo, 468 U.S. 705, 712-13, 104 S. Ct. 3296, 3302 (1984) ("The existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated. . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation."); Warden v. Hayden, 387 U.S. 294, 304, 87 S. Ct. 1642, 1648 (1967); Silverman v. United States, 365 U.S. 505, 511, 81 S. Ct. 679, 682 (1961). It would thus be inconsistent with the Court's

62

overall approach to adopt a plane-of-the-door rule here.  Santana is consistent with the Court's dominant Katz approach, and even cited Katz in its reasoning section. It recognizes that where the privacy of the home has been relinquished, the home arrest rule has no application.

Finally, Santana contains the correct reading of the Fourth Amendment because that reading is the more reasonable one.  The "touchstone" of the Fourth Amendment is reasonableness.  See, e.g., Samson v. California, 126 S. Ct. 2193, 2201 (2006); Brigham City v. Stuart, 126 S. Ct. 1943, 1947 (2006); Bd. of Educ. v. Earls, 536 U.S. 822, 828, 122 S. Ct. 2559, 2564 (2002).  The reasonableness requirement applies with equal force to the home.  In Maryland v. Buie, 494 U.S. 325, 110 S. Ct. 1093 (1990), the Court stated:

> Our cases show that in determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. . . . Under this test, a search of the house or office is generally not reasonable without a warrant issued on probable cause.  There are other contexts, however, where the public interest is such that neither a warrant nor probable cause is required.

Id. at 331, 110 S. Ct. at 1096-97.  See also Stuart, 126 S. Ct. at 1947; Illinois v. McArthur, 531 U.S. 326, 331, 121 S. Ct. 946, 950 (2001) (where search "avoid[ed] significant intrusion into the home itself," the Court said, "rather than employing a per se rule of unreasonableness, we balance the privacy-related and law

enforcement-related concerns to determine if the intrusion was reasonable.").

Here, the balance of privacy-related and law-enforcement-related concerns clearly points in favor of the Santana rule. By hypothesis, the privacy interest is minimal or nonexistent because the suspect has exposed his doorway to the officers and relinquished any privacy interest therein. On the government side of the balance, in addition to the government's obvious interest in arresting the suspect, there is a strong governmental interest in officer safety. The Court has long recognized that officer safety is a concern whenever officers and arrestees or potential arrestees are in close proximity. See, e.g., United States v. Robinson, 414 U.S. 218, 226, 94 S. Ct. 467, 472 (1973) (adopting search-incident-to-arrest rule in part for officer-safety rationale); Chimel v. California, 395 U.S. 752, 763, 89 S. Ct. 2034, 2040 (1969) (authorizing limited warrantless and suspicionless search of home incident to lawful arrest of suspect for officer-protection rationale).

In Buie the Court candidly acknowledged the risks officers face when they arrest a suspect in the home. There the Court allowed a limited warrantless safety sweep of the home, incident to arrest of a suspect, upon reasonable suspicion, and noted:

> The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep,

> in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

Buie, 494 U.S. at 333, 110 S. Ct. at 1098. When a suspect answers a knock at the door, and probable cause exists to arrest that suspect, this same officer safety rationale is if anything more pressing. The officers and the actual suspect are separated by arm's length only. Requiring actual exigent circumstances to develop, say by the suspect drawing a gun, could be fatal in many situations. And there is little or no price for ensuring officer safety by allowing the arrest, because there is no privacy interest at stake.

By contrast, the majority opinion's rule allows a suspect for whom there is probable cause to open the door and thumb his nose in officers' faces so long as exigent circumstances do not exist. The majority rule serves no Fourth Amendment interest, because by hypothesis the privacy interest has been relinquished. And it subjects officers to the risk of danger. Nor is it improper for officers to knock on a door without a warrant when the public could do so. See United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006). In some cases there may not even have been a prior opportunity to get a warrant. Cases show that

65

officers legitimately find themselves at an open door with probable cause and no warrant in a variety of situations where exigent circumstances are not yet present. See, e.g., United States v. Gori, 230 F.3d 44, 47 (2d Cir. 2000) (officers conducting stakeout observed by delivery person, accompanied delivery person to door because worried that delivery person would notify suspects); United States v. Vaneaton, 49 F.3d 1423, 1425 (9th Cir. 1995) (officers investigating notorious itinerant burglar happened to come across him staying at the same motel where crime committed); United States v. Sewell, 942 F.2d 1209, 1211 (7th Cir. 1991) (probable cause developed at the open door). In addition, the Santana rule does not discourage officers from obtaining warrants, as there is no guarantee that anyone (much less the suspect) will answer the door when officers come knocking. By contrast, the plane-of-the-door rule ties officers' hands in a potentially volatile situation, and precludes them from taking preventive action that might save officers' lives. It is thus unreasonable, in addition to being inconsistent with precedent.

Because of all of the reasons supporting the Santana rule–its precedential authority, its consistency with Payton, its consistency with Fourth Amendment jurisprudence, and its reasonableness–most courts considering the doorway arrest situation have followed the Santana rule. See United States v. Gori, 230 F.3d 44,

66

52 (2d Cir. 2000);[8] <u>McKinnon v. Carr</u>, 103 F.3d 934, 935 (10th Cir. 1996); <u>United States v. Vaneaton</u>, 49 F.3d 1423, 1427 (9th Cir. 1995); <u>United States v. Sewell</u>, 942 F.2d 1209, 1212 (7th Cir. 1991); <u>Duncan v. Storie</u>, 869 F.2d 1100, 1102 (8th Cir. 1989) (but finding fact issue on voluntariness); <u>United States v. Carrion</u>, 809 F.2d 1120, 1128 (5th Cir. 1987) (following <u>Santana</u> and <u>United States v. Mason</u>, 661 F.2d 45, 47 (5th Cir. Nov. 9, 1981)); <u>City of Fargo v. Steffan</u>, 639 N.W.2d 482, 484 (N.D. 2002); <u>State v. Santiago</u>, 619 A.2d 1132, 1135 (Conn. 1993); <u>People v. Morgan</u>, 447 N.E.2d 1025, 1028 (Ill. 1983); <u>State v. Patricelli</u>, 324 N.W.2d 351, 354 (Minn. 1982).[9] The cases following the plane-of-the-door approach are less numerous and, on the whole, less well reasoned. <u>See</u> <u>United States v. Bradley</u>, 922 F.2d 1290, 1295 (6th Cir. 1991); <u>State v. Clark</u>, 844 S.W.2d 597, 599 (Tenn. 1992) (following <u>Payton</u>, though without citing <u>Santana</u>); <u>State v.</u>

---

[8] I acknowledge there is some tension between <u>Gori</u> and a pre-<u>Payton</u> Second Circuit decision, <u>United States v. Reed</u>, 572 F.2d 412 (2d Cir. 1978). In any event, my position is considerably narrower than <u>Gori</u>: I would hold that an officer may intrude no further than the area that has been voluntarily exposed, whereas <u>Gori</u> appeared to allow an officer to seize anyone who might be visible through the opened door, even if located outside the immediate doorway area.

[9] The majority opinion cites <u>Loria v. Gorman</u>, 306 F.3d 1271, 1284 (2d Cir. 2002). This case dealt with a classic <u>Payton</u> situation, where the officer pushed open the door and forced his way inside to arrest the suspect. <u>See</u> <u>Loria</u>, 306 F.3d at 1286 ("Loria was not in the doorway. Rather, he was at least a door's width inside the house when he attempted to close the door."). The Second Circuit appears to adhere to the <u>Santana</u> rule at the open door. <u>See</u> <u>United States v. Gori</u>, 230 F.3d 44, 52 (2d Cir. 2000) ("The facts critical to the analysis are that the interior of Apartment 1M was exposed to public view when the door was voluntarily opened. And the principle that governs those facts is found in <u>United States v. Santana</u>, not <u>Payton</u>."). <u>But cf.</u> <u>United States v. Reed</u>, 572 F.2d 412 (2d Cir. 1978).

Ault, 724 P.2d 545, 552 (Ariz. 1986) (holding doorway arrest illegal, though without citing Payton or Santana); State v. Holeman, 693 P.2d 89, 91 (Wash. 1985) (following Payton, though without citing Santana); State v. Morse, 480 A.2d 183, 186 (N.H. 1984) (following Payton); State v. George, 317 N.W.2d 76, 80 (Neb. 1982) (same, without citing Santana). For example, only two of the cases following the plane-of-the-door approach even cited Santana: Bradley and Morse.[10]

_____

[10] The majority opinion also argues that "few, if any" of the cases cited in this paragraph involved a physical crossing of the plane of the door. One of the cases definitively involved a reaching across the plane of the door. See City of Fargo v. Steffan, 639 N.W.2d 482, 483 (N.D. 2002). Other cases did not specify whether the arrest was physical or non-physical, instead simply stating that an "arrest" occurred. See United States v. Whitten, 706 F.2d 1000, 1015 (9th Cir. 1983); United States v. Mason, 661 F.2d 45, 47 (5th Cir. Nov. 9, 1981); State v. Santiago, 619 A.2d 1132, 1135 (Conn. 1993); State v. Patricelli, 324 N.W.2d 351, 352 (Minn. 1982). Because the cases involved doorway arrests, common sense indicates that at least some of them are bound to have involved a physical crossing. Moreover, it makes sense that those opinions did not specify the precise means of the arrest, because they relied not on whether the plane of the door was crossed, but rather on the absence of an expectation of privacy.

Still other cases involved facts where the suspect opened the door and the officers accomplished the arrest by non-physical means. For example, in some cases the officer arrested the suspect by telling the suspect he was under arrest; in others by pointing a gun at the suspect. But in almost all of these cases, the reasoning was not based on the absence of a physical crossing. These courts upheld the arrest not because it was non-physical, but rather because the suspect no longer had an expectation of privacy. See United States v. Gori, 230 F.3d 44, 47 (2d Cir. 2000) (officer said "Everyone step out into the hallway!"); McKinnon v. Carr, 103 F.3d 934, 935 (10th Cir. 1996) (officers told suspect he was under arrest, then followed him into home to retrieve his clothes); United States v. Vaneaton, 49 F.3d 1423, 1425 (9th Cir. 1995) (officer told suspect he was under arrest, then entered hotel room); United States v. Carrion, 809 F.2d 1120, 1123 (5th Cir. 1987) (officer pointing gun ordered suspect to raise hands, then entered room to physically arrest); People v. Morgan, 447 N.E.2d 1025, 1027 (Ill. 1983) (officers told suspect he was under arrest, then accompanied into home to obtain clothes). In fact, in McKinnon, Vaneaton, Carrion, and Morgan, the officers physically crossed the plane of the door immediately after initiating the arrest. These cases are thus legally indistinguishable from the instant case, where the officers also violated no expectation of privacy.

Only two jurisdictions appear to recognize a distinction between physical and non-

68

The Santana approach should be the law of this circuit, for the reasons discussed in detail above.[11]

As Santana is so clearly on point, the majority opinion also attempts to distinguish Santana on its facts. The majority opinion asserts that McClish was not as exposed to public view as Santana was; that Santana was not clearly inside her

_____

physical arrests. The Seventh and Eighth Circuits require officers to announce their intention to arrest before physically crossing the plane of the door. Compare United States v. Sewell, 942 F.2d 1209, 1210 (7th Cir. 1991) (arrest constitutional where officers arrested suspect at the door, before entering the apartment) with United States v. Berkowitz, 927 F.2d 1376, 1385-88 (7th Cir. 1991) (arrest unconstitutional where officers crossed plane before announcing suspect was under arrest). See also Duncan v. Storie, 869 F.2d 1100, 1103 (8th Cir. 1989) (version of facts where officers told suspect he was under arrest and told him to come out of house would state no constitutional violation, but version where officers physically arrested before telling suspect he was under arrest would be unconstitutional). However, the distinction made in these cases is not well founded. Whether the officer accomplishes the arrest by reaching across the plane of the door or by pointing a gun, if the officer has not violated an expectation of privacy, he has not violated the Fourth Amendment under Santana.

[11] The Fourth Circuit dealt with a doorway arrest scenario in United States v. McCraw, 920 F.2d 224 (4th Cir. 1990), a case cited in the majority opinion. But there the suspect opened the door only a crack, and therefore did not relinquish his Payton expectation of privacy. Id. at 228. As a result, the Court was not dealing with a true Santana situation, and did not have occasion to consider what rule should apply at the voluntarily opened doorway. In fact, the Fourth Circuit explicitly recognized that "Mathis did not relinquish completely his expectation of privacy." Id. at 229. McCraw therefore did not settle whether Santana or Payton applies in the Fourth Circuit.

As discussed supra, note 10, the Seventh and Eighth Circuits have adopted a modified Santana approach. They require officers to announce an intention to arrest before physically crossing the plane of the door. But since these circuits allow an arrest to occur at the open door without a warrant where the suspect is firmly inside the home, and since they appear to allow officers to cross the plane so long as they first announce their intention to arrest, they should be counted as having substantially adopted the Santana approach.

The majority opinion also attempts to distinguish some of the cases adopting the Santana approach on their facts. But these factual distinctions are of limited relevance, given that the cases clearly adopted the reasoning of Santana at the open doorway: reasoning based only on the expectation of privacy or lack thereof.

69

home; that Santana's home was on a public street; that Santana was already on the threshold when police arrived; and that Santana's home was being used for drug activity. But Santana's holding did not rely on any of these facts.[12] Even the fact

---

[12] Moreover, many of these factual distinctions cannot play any role under the Fourth Amendment. The location of Santana's home in an urban area cannot have reduced her Fourth Amendment protection: distinctions among kinds of homes would give less Fourth Amendment protection to the "ruined tenement," in violation of the Pitt quote. The presence of drug activity cannot be relevant: that would eviscerate the Payton rule by allowing officers to enter when they have probable cause of criminal activity, when Payton's whole purpose is to require a warrant even when officers have the strongest suspicion of criminal activity. Finally, the majority opinion says that the "Court found significant" the fact that Santana retreated into her home and held money given to her in a drug transaction. These facts, however, were relevant to the hot pursuit portion of the opinion, not the arrest portion. See Santana, 427 U.S. at 40-41, 96 S. Ct. at 2408-09.

The majority opinion also suggests that Santana might be distinguishable because of the route the officers took to get to McClish's front door. However, McClish has waived any argument based on the officers' approach, and therefore cannot contend that they did not have a right to be in their location on the porch. As the majority opinion notes, "[a]lthough the legality of the officers' entry onto the porch was argued in the district court, this issue was not raised on appeal and, in light of our holding today, does not need to be addressed."

Such an argument, even if raised, likely would have been unsuccessful. According to the district court, the gate that the officers opened, and that had a "no trespassing" sign on it, was not even on McClish's property and thus was not located within the curtilage of his home. It therefore most likely was not protected by the Fourth Amendment. See Oliver v. United States, 466 U.S. 170, 178, 104 S. Ct. 1735, 1741 (1984) ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."); United States v. Taylor, 458 F.3d 1201, 1208 (11th Cir. 2006) ("A perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property.").

Then, when the officers did cross McClish's curtilage to reach his front door, they in all likelihood did not violate the Fourth Amendment because they took the path that any visitor would have taken to knock on the front door. See Taylor, 458 F.3d at 1204 ("The Fourth Amendment. . . is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises. . . . Absent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking questions of the occupant thereof."). In any event, because McClish waived any reliance on those facts, we need not decide whether the

70

that Santana was half inside and half outside the home was not relied upon in the opinion. That fact was mentioned in the facts section of the opinion, not the reasoning section. See Santana, 427 U.S. at 40 n.1, 96 S. Ct. at 2408 n.1. The reasoning of Santana was brief and to the point: "She was not in an area where she had any expectation of privacy." Id. at 42, 96 S. Ct. at 2409. The case relied simply on the absence of an expectation of privacy.

Similarly, McClish had no expectation of privacy in the immediate doorway area after he voluntarily opened the door. In my judgment, the Santana rule controls the instant case. It contains a holding that is directly on point, in contrast to the dicta about "threshold" in Payton. It allows a warrantless arrest only when the suspect has voluntarily relinquished the privacy protected by Payton, and is thus consistent with Payton's privacy-protection rationale. It is more consistent with Fourth Amendment law in general, as it does not create a bright-line rule, or rely on the property law concept of the plane of the door. Finally, it achieves a workable balance between the public and private interests at stake. I submit that the officers did not violate McClish's Fourth Amendment rights by reaching through the plane of the voluntarily opened door. I therefore respectfully dissent from that portion of the opinion holding that the officers violated the Constitution.

approach to the door violated the Fourth Amendment.

71