[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14201

_____

D.C. Docket No. 6:13-cv-00224-GAP-GJK

ELVAN MOORE,

Plaintiff-Appellant,

versus

KEVIN PEDERSON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 16, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and PROCTOR,[*] District Judge.

ROSENBAUM, Circuit Judge:

Dorothy may have said it best when she said, "There is no place like home."[1]  Though we are pretty sure that she was not talking about the Fourth Amendment, she may as well have been.  Under the Fourth Amendment, the home is a sacrosanct place that enjoys special protection from government intrusion.  The government may not enter a person's home to effect an arrest without a warrant or probable cause plus either consent or exigent circumstances.  For this reason, we hold today that, in the absence of exigent circumstances,[2] the government may not conduct the equivalent of a *Terry*[3] stop inside a person's home.  But because the law on this point was not clearly established in this Circuit before our decision today, we affirm the district court's entry of summary judgment on qualified-immunity grounds to Defendant-Appellee Deputy Kevin Pederson, who reached into Plaintiff-Appellant Elvan Moore's home to arrest and handcuff him when, in the course of what Pederson described as a *Terry* stop, Moore declined to identify

---

[*] The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] L. Frank Baum, *The Wonderful Wizard of Oz* 46, http://ir.nmu.org.ua/bitstream/handle/123456789/123102/cb6151959dc6ecf6e71dc17715e88d24.pdf?sequence=1.

[2] We find that this case does not involve exigent circumstances, so we do not explore today what particular exigent circumstances may justify an officer's entry into a home without a warrant and may permit the officer to conduct what is effectively a *Terry* stop inside the home.

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

himself in response to Pederson's questioning.  We also affirm the district court's dismissal of Moore's state-law claim for intentional infliction of emotional distress.

## I.

In the early morning hours of November 15, 2008, Defendant Seminole County Sheriff's Deputy Kevin Pederson was working road patrol.  He received a dispatch from the Sheriff's Office in response to a call from someone at the Colonial Grand apartments.  The complainant reported that a male and two females were outside, yelling at one another, though the complainant added that the dispute did "not sound violent."

At approximately 4:45 a.m., Pederson arrived at the apartment complex. When Pederson got there, the caller met him and explained that a man and two women had been arguing in the parking lot and that one of the women had left in a white vehicle.  According to the caller, verbal disputes involving these people were "an everyday occurrence."  The caller then directed Pederson to Plaintiff Elvan Moore's apartment as the unit into which the couple retreated.

Based on this information, Pederson approached Moore's residence to further investigate the situation.  As he neared the door, he heard what he described sounded like an argument, though he could not make out any words.  In addition, Pederson stated that he heard music coming from the apartment.

3

Pederson knocked on Moore's door.  When Moore opened the door, he was wearing a towel wrapped at the waist, and two women were visible inside the apartment—one naked and one clothed.  Though neither woman asked for assistance or otherwise indicated she was in distress, Pederson stated that he thought that one of the women "had a scowl on her face" and "appeared visibly upset, pissed off," but he could not discern at whom she was mad.  From Pederson's "initial impression," he thought "maybe this is a girlfriend that just walked in on a boyfriend who is with another woman."

Pederson began interviewing Moore in order to investigate Moore's involvement in the parking-lot disturbance.  In addition, Pederson explained, he did not know whether "a domestic violence situation" existed, based on what he had seen.

In response to the questioning, Moore expressed lack of knowledge that a parking-lot disturbance had occurred, and when Pederson requested that Moore provide his name and identification, Moore declined.  Moore also refused subsequent requests from Pederson to identify himself.

At some point during the conversation and after Moore's multiple refusals to provide identification, Pederson handcuffed Moore.  At the time, Moore was

4

standing inside the doorway of his apartment.[4]  After Pederson handcuffed Moore, Pederson led Moore, who was still wearing a towel when he was handcuffed, from the doorway of his apartment to the patrol vehicle.

During the walk to the patrol vehicle, Moore's towel fell off.[5]  After placing Moore in the patrol vehicle, Pederson took Moore to the police station where he was booked and eventually provided a jump suit to wear.  Moore was subsequently charged with violating Florida Criminal Statute 843.02: resisting officer – obstructing without violence.  The charges against Moore were eventually dropped.

## II.

Following these events, Moore filed an amended complaint asserting claims for, among other things, unlawful arrest in violation of 42 U.S.C. § 1983 ("§ 1983") and intentional infliction of emotional distress (under Florida law).[6]

---

[4] Pederson attested that the arrest and handcuffing occurred outside of Moore's apartment.  Since we are reviewing the entry of summary judgment against Moore, however, we accept for purposes of our analysis Moore's version of the facts where a conflict between Moore's and Pederson's stories exists.

[5] Again, the parties' versions of the facts diverge here.  Pederson asserted that Moore wore a towel that remained on throughout the entire period that he was in Pederson's custody.

[6] Besides these claims, Moore's amended complaint alleged state-law claims for false arrest and  malicious prosecution against Pederson and also asserted claims of invasion of privacy and failure to train and supervise in violation of 42 U.S.C. § 1983 against several other entities.  The district court dismissed all of these claims.  On appeal, without identifying any issues relating to these claims in his statement of issues and without making any actual arguments about these claims in his appellate brief, Moore attempts to incorporate by reference his arguments regarding these other state claims contained in his brief in opposition to Pederson's motion for summary judgment filed in the district court, explaining that he does so

5

According to the amended complaint, Moore claimed that he was unlawfully arrested without probable cause based only on his refusal of Pederson's request to provide biographical information for a report.

Pederson filed a motion for summary judgment on all claims, and Moore filed a cross-motion for summary judgment on his § 1983 claim. The district court granted summary judgment in favor of Pederson on all claims. We now affirm.

## III.

We review *de novo* the district court's disposition of a summary-judgment motion based on qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Summary judgment should be entered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we consider the record and draw all reasonable inferences in the light most favorable to the non-moving

---

"[i]n the interest of page limits compliance." We have explained many times that "a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Good reasons for this rule exist. Among others, Moore's brief opposing summary judgment before the district court does not explain what defects Moore perceives in the district court's ruling, which was obviously entered after Moore filed the brief that he asks us to consider. So we (and Pederson) would have to divine what in particular Moore thought was problematic about the district court's decision. That is not how our adversarial system works. We further note that nothing prevented Moore from requesting permission to exceed the page limit if he had good cause to do so, but Moore never made such a request. Because Moore has not briefed any issues regarding these other state-court claims, any issues relating to them are deemed abandoned.

6

party.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam); *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012).

## IV.

The qualified-immunity defense balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).  Qualified immunity exists "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."  *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003).

In pursuit of that aim, qualified immunity protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known."  *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013) (quotation marks, and brackets omitted).  Under its strictures, "all but the plainly incompetent or one who is knowingly violating the federal law" is exposed to liability.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery."  *Holmes v. Kucynda*, 321 F.3d

7

1069, 1077 (11th Cir. 2003) (internal quotation marks omitted).  This safeguard, however, does not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]."  *Id.* (internal quotation marks & alteration omitted).

Qualified immunity requires a public official to show first that he was acting within the scope of his or her discretionary authority.  *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013).  We have said that the term "discretionary authority" "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority."  *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted).  Here, there is no question that Pederson satisfied this requirement, as Pederson engaged in all of the challenged actions while conducting investigative and arrest functions as a deputy sheriff and while on duty.[7]

Because Pederson has established that he was acting within the scope of his discretionary authority, the burden shifts to Moore to demonstrate that qualified

---

[7] Although Moore argues in his opening brief that Pederson was not acting within the scope of his duties, Moore did not raise this challenge in response to Pederson's motion for summary judgment in front of the district court.  Consequently, Moore forfeited this argument. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) ("[A]bsent extraordinary circumstances, legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal.").  And even if he had not forfeited the argument, we find that it lacks merit.

immunity is inappropriate. *See id.* Moore must show that, when viewed in the light most favorable to him, the facts demonstrate that Pederson violated Moore's constitutional right and that that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of Pederson's actions. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). We may decide these issues in either order, but, to survive a qualified-immunity defense, Moore must satisfy both showings. *Maddox*, 727 F.3d at 1120-21 (citation omitted).

## A.

We start by considering whether Pederson transgressed any of Moore's constitutional rights. We find that he did. In particular, Pederson violated Moore's right to be free from unreasonable seizures.

## 1.

Stemming from the origins of our nation, the home has always been viewed as a sacrosanct place with unique rules that apply to it. *See Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980) ("The zealous and frequent repetition of the adage that a 'man's house is his castle,' made it abundantly clear that both in England[] and in the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty"). Indeed, the Framers considered the hallowed stature of the home to be so important that they directed two amendments in the

9

Bill of Rights at it, protecting the privacy of the home with both the Fourth Amendment and the Third Amendment.[8]

With respect to the Fourth Amendment, the Supreme Court has opined that the "physical entry of the home is the chief evil against which the wording of [that provision] is directed." *United States v. U.S. Dist. Ct. for E.D. Mich., S. Div.*, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134 (1972). Looking to the language of the Fourth Amendment, it is easy to understand the Supreme Court's reasoning. The Fourth Amendment strictly commands, "The right of the people to be secure in their persons [and] houses . . . against unreasonable . . . seizures, shall not be violated . . . ." U.S. CONST. amend IV. Under it, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons . . . to be seized." *Id.*

As the Supreme Court has explained, the Fourth Amendment "draw[s] a firm line at the entrance to the house." *Payton*, 445 U.S. at 590, 100 S. Ct. at 1382. As a result, "warrantless arrest in a home violates the Fourth Amendment unless the arresting officer had probable cause to make the arrest *and* either consent to enter or exigent circumstances demanding that the officer enter the home without a warrant." *Bashir v. Rockdale Cnty., Gal.*, 445 F.3d 1323, 1328 (11th Cir. 2006).

---

[8] The Third Amendment, which is not at issue in this case, provides, "No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law." U.S. CONST. amend. III.

10

But make no mistake:  in the absence of these stringent circumstances, for the purpose of arresting a person without a warrant, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much . . . ."[9] *Kyllo v. United States*, 533 U.S. 27, 37, 121 S. Ct. 2038, 2045 (2001) (citation omitted).

Applying these rules, in *McClish v. Nugent*, 483 F.3d 1231 (11th Cir. 2007), we held that an officer who, without a warrant, or probable cause along with exigent circumstances or consent, "reached into [a] house, grabbed [the plaintiff], and forcibly pulled him out onto the porch" in order to arrest him, violated the plaintiff's Fourth Amendment rights.

## 2.

Moore's case is not materially different.  Like the officer in *McClish*, Pederson did not have a warrant, and he lacked probable cause, exigent circumstances, and consent.  He nonetheless breached Moore's home's threshold for the purpose of arresting Moore when he handcuffed Moore, who was standing inside his apartment's doorway at the time.  As a result, Pederson violated Moore's Fourth Amendment right to be free from unreasonable seizures.

---

[9] If we were speaking in terms of football, we might say that it is a Fourth Amendment violation if any part of the law-enforcement officer breaks the plane of the home to conduct a warrantless arrest without probable cause and either consent or exigent circumstances. *See 2015 NFL Rulebook*, Rule 3, § 39, http://operations.nfl.com/the-rules/2015-nfl-rulebook/ ("It is a Touchdown if any part of the ball is ***on, above, or behind the opponent's goal line*** while legally in possession of an inbounds player, provided it is not a touchback.") (emphasis added).

11

While Pederson contends that he had probable cause to arrest Moore for his alleged violation of Fla. Stat. § 843.02, which makes it illegal to resist an officer without violence, serious problems doom Pederson's argument. To begin with, Pederson's position necessarily depends on the conclusion that Moore refused to provide his identification to Pederson during a lawful *Terry* stop, but Pederson did not conduct a lawful *Terry* stop.

In *Terry v. Ohio*, the Supreme Court held that an officer does not violate the Fourth Amendment by conducting a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 675 (2000) (citing *Terry*, 392 U.S. at 30, 88 S. Ct. at 1868). A *Terry* stop is a type of seizure under the Fourth Amendment because it restrains the freedom of the detainee to walk away or otherwise remove himself from the situation. *Terry*, 392 U.S. at 16, 88 S. Ct. at 1877. The standard of "reasonable suspicion" that is required to justify a *Terry* stop is significantly more lenient than that of "probable cause," which is necessary to support a warrant. *Id.* at 123, 120 S. Ct. at 675-76.

Pederson asserts that, when he initially approached Moore's door, he had reasonable, articulable suspicion of a breach of the peace, based on the complainant's report about the parking-lot dispute and the music and argument emanating from inside Moore's apartment. For purposes of our discussion, we will

12

assume that he is correct.[10]   Pederson bolsters his reasonable-suspicion argument

by relying on his assessment of the situation after Moore opened the door—

namely, that he had reasonable, articulable suspicion that a possible ongoing

domestic dispute related to the parking-lot incident could have been occurring.

These circumstances, Pederson suggests, independently allowed him to continue

his *Terry* stop.

But significantly, the circumstances in this case did not satisfy the definition

of "exigent circumstances" either before or after Pederson's interaction with

Moore.   Before Pederson knocked on Moore's door, all he knew was that a

neighbor had complained of a non-violent argument in the parking lot where one of

the participants had left the scene, and Pederson heard what he believed could have

been arguing and music coming from inside the apartment.   These facts are a far

---

[10] Even if he is not, Pederson could have lawfully knocked on Moore's front door seeking to ask him questions outside the context of a *Terry* stop.  *Morris v. Town of Lexington, Ala.*, 748 F.3d 1316, 1324 (11th Cir. 2014) (citing *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1416 (2013).  As we have explained, "officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just [as] any private citizen may."  *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (alteration, internal quotation marks, and citation omitted).  But an important difference exists between a *Terry* stop and the type of interaction that occurs when a person responds to an officer's knock on the door and engages in conversation with that officer: the mandatory versus the voluntary nature of the interaction.   In the *Terry* stop, the person is detained within the meaning of the Fourth Amendment; he cannot simply walk away or otherwise avoid the encounter.  But when a citizen is not detained by a *Terry* stop or otherwise lawfully detained and chooses to speak with an officer, that citizen has the right to cease answering questions and walk away from the officer; the encounter is entirely voluntary.  When this type of interaction occurs as the result of a citizen's decision to speak with officers after they knock on the door of his home, provided that no warrant or probable cause and exigent circumstances exist, the citizen has the right to terminate his voluntary participation in the conversation by retiring into his home and closing the door.

13

cry from an "emergency situation[] involving endangerment to life" that we have previously described as constituting exigent circumstances. *See, e.g.*, *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002).

And after Moore opened the door for Pederson, nothing that Pederson reported observing established or even suggested that anyone's life or health was at risk. At worst, Pederson saw a naked man, a naked woman, and a clothed woman with a scowl on her face. No one appeared injured in any way; Pederson did not report seeing any furniture or other items strewn about; and Pederson did not identify any behavior or conduct that suggested that any of the occupants of the residence contemplated violence in any way. Moreover, while the complainant reported hearing arguments from that apartment on other occasions, which he considered a nuisance, he specifically described the disputes as "verbal" and non-violent. This is not the stuff of which life- or limb-threatening emergencies that constitute "exigent circumstances" are made.

As a result, Pederson could not have lawfully executed a *Terry* stop in this case. Because Pederson did not have a warrant and he was not conducting a lawful *Terry* stop when Moore was inside his home, Moore was free to decide not to answer Pederson's questions. *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 1862 (2011) ("When the police knock on a door . . . [and the] occupant chooses to open the door and speak with the officers, the occupant need not allow the officers

to enter the premises and may refuse to answer any questions at any time."). Consequently, Moore's refusal to answer Pederson's requests for identification could not have served as the basis for a violation of Fla. Stat. § 843.02, resisting an officer without violence, and Pederson lacked probable cause to arrest Moore for this violation.

We have said that an officer may not enter the home for the purpose of effecting a warrantless arrest unless that officer has both probable cause and either exigent circumstances or consent. *Bashir*, 445 F.3d at 1328. So we cannot see how law enforcement could enter a home to detain a person on reasonable, articulable suspicion of a criminal violation (resisting an officer without violence)—a much lower standard than probable cause—when neither exigent circumstances nor consent exist. That just makes no sense to us. *See United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) ("It would defy reason to hold . . . that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest.").

In the absence of probable cause and without a warrant, Pederson could not have lawfully entered Moore's premises for the purpose of arresting him. Because Pederson reached into Moore's home to arrest him, anyway, Pederson violated Moore's constitutional right to be free from unreasonable seizure.

15

## VI.

Having determined that Pederson violated Moore's Fourth Amendment right to be free from unreasonable seizure, we consider whether, as of November 15, 2008, when Pederson arrested Moore, the parameters of that right as it arose in this case were clearly established. We find that they were not.

The touchstone of qualified immunity is notice. *Holmes v. Kucynda*, 321 F.3d 1069, 1078 (11th Cir. 2003). The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).

Our Circuit uses two methods to determine whether a reasonable official would understand that his conduct violates a constitutional right. *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). The first requires the court to examine whether "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) [have] clearly establish[ed] the law." *McClish*, 483 F.3d at 1237 (citation omitted). This method does not require "[e]xact factual identity with a previously decided case" but rather demands that "the unlawfulness of the conduct must be apparent from the pre-existing law." *Coffin*, 642 F.3d at 1013 (citations omitted).

16

The second approach asks whether the officer's "conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law" on point. *Fils*, 647 F.3d at 1291 (alteration in original) (citation and quotation marks omitted).  Even in the absence of caselaw holding the specific conduct unlawful, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Coffin*, 642 F.3d at 1014-15; *see Fils*, 647 F.3d at 1291.  But this principle offers a narrow exception to the general rule that only caselaw and specific factual scenarios can clearly establish a constitutional violation and is reserved for rare cases. *Coffin*, 642 F.3d at 1015.

Moore does not point to a particular Supreme Court, valid Eleventh Circuit, or Florida Supreme Court case that he contends clearly established that *Terry*-like stops may not be conducted in the home.  Instead, he asserts that it was clearly established that a *Terry* stop could not occur inside the home because all cases approving of *Terry* stops involve temporary detentions in public places, not in homes.  In further support of his argument, Moore points to a vacated Eleventh Circuit case and cases outside this Circuit where courts have opined that a *Terry* stop cannot occur in the home.  We disagree that Moore has demonstrated that the law was clearly established in this case as of November 15, 2008, that an officer

17

may not conduct a *Terry*-like stop in the home in the absence of exigent circumstances.

First, the mere dearth of binding caselaw holding that a particular activity is constitutional cannot, in and of itself, clearly establish that that activity is unconstitutional or otherwise impermissible. Indeed, that Moore discovered no valid, binding caselaw that holds that a *Terry*-like stop *can* be conducted in a home does not somehow clearly establish the principle that a *Terry*-like stop *cannot* be executed in a home.

Nor does Moore find the necessary support in the cases he cites. Moore relies on a vacated Eleventh Circuit case, two Ninth Circuit cases that were issued after November 15, 2008, and a Tenth Circuit case that was issued in May 2008. To state the obvious, *United States v. Tobin*, 890 F.2d 319, 327 (11th Cir. 1989), *vacated*, 902 F.2d 821 (11th Cir. 1990), the Eleventh Circuit case on which Moore relies, was vacated. That means it has no legal force, so it could not have clearly established the law.

While Moore acknowledges as much, he suggests that the Eleventh Circuit's subsequent *en banc* opinion in *Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (en banc) ("*Tobin II*"), clearly established that an in-home *Terry*-like stop violates the Fourth Amendment when it stated that "reasonable suspicion cannot justify the warrantless search of a house." Not only does the quotation that Moore cites

address warrantless searches, not *Terry*-like stops, but review of the entire quotation—"Reasonable suspicion cannot justify the warrantless search of a house, ***but it can justify the agents' approaching the house to question the occupants***," 923 F.3d at 1511 (emphasis added) (citation omitted)—does not "dictate[], that is, truly compel[], the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiff['s] federal rights in the circumstances." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc) (citation and internal quotation marks omitted).

In fact, a panel of this Court, relying on the same quotation about "warrantless search[es]" in *Tobin II* on which Moore hangs his hat, said only that "[w]e are skeptical that 'reasonable suspicion' is the correct standard for justifying the officers' entry" into the home. *Morris*, 748 F.3d at 1323 n.17. If, as recently as last year, a panel of this Court was, at worst, "skeptical" that *Terry*-like stops could occur in the home, we cannot say that the law on that point was "clearly established" for officers six-and-one-half years ago. For this reason, Moore's argument must fail, regardless of the caselaw from other jurisdictions.[11]  And we

---

[11] As for the cases from other jurisdictions, first, in and of themselves, they cannot clearly establish the law in this Circuit. *See McClish*, 483 F.3d at 1237. Second, the Ninth Circuit cases that Moore cites—*United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010), and *United States v. Perea-Rey*, 680 F.3d 1179, 1185-86 (9th Cir. 2012)—both postdate the events in this case, so they could not have put Pederson on notice that *Terry*-like stops cannot occur in the home even outside this Circuit. And finally, as of the time of the events in this case, at least one circuit had applied a *Terry* analysis to an investigatory stop of people in their hotel room, suggesting that if sufficient facts to establish reasonable suspicion exist, a *Terry*-like stop

cannot conclude that in November 2008 the law was clearly established in this Circuit that a *Terry*-like stop cannot be conducted in the home, in the absence of exigent circumstances. As a result, the district court correctly found that Pederson was protected by qualified immunity.

## VII.

Finally, we turn to the district court's entry of summary judgment for Pederson on Moore's claim for intentional infliction of emotional distress.

In Florida, to prove intentional infliction of emotional distress, a plaintiff must show that (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Gallogly v. Rodriguez*, 970 So. 2d 470, 471 (Fla. Dist. Ct. App. 2007). Regarding the second prong, even tortious or criminal intent, or intent to inflict emotional distress, standing alone, is not enough. *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 279 (Fla. 1985) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Nor is "conduct [that] has been characterized by 'malice,' or a degree of aggravation

---

may be conducted in the home. *See United States v. Jerez*, 108 F.3d 684, 693-94 (7th Cir. 1997). This means that in the absence of caselaw on this point from the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court, at best, disagreement among other circuits existed as to whether a *Terry*-like stop could be conducted in the home. "If judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *McClish*, 483 F.3d at 1249 (citation and internal quotation marks omitted).

which would entitle the plaintiff to punitive damages for another tort." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Instead, Florida courts have found "'[l]iability . . . only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Indeed, only those situations where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" satisfy the standard required to establish a claim of intentional infliction of emotional distress. *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (AM. LAW. INST. 1965)). Nonetheless, in situations involving government authority, courts recognize that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position" and consequently "give greater weight to the fact that the defendants had actual or apparent authority over [the plaintiff] as police officers." *Gallogly*, 970 So. 2d at 472 (quotation marks omitted).

Moore argues that Pederson "forced" Moore to be naked and refused to allow Moore to put on clothing, and he alleges that both acts constituted extreme and outrageous conduct. Under Moore's recollection of the facts, Pederson arrested Moore while Moore was wearing a towel wrapped around his waist. On

21

the walk from Moore's front door to the police car, Moore's towel began to fall off, completely dropping by the end of the first five feet of the walk.[12]  For the remaining fifteen feet, Moore was completely naked.  When Moore asked two separate people to bring him clothes, Pederson responded by instructing them to stay where they were, or he would arrest them as well.

Upon arrival at the Sheriff's Office, Moore saw a woman approaching to process him.  In response, Moore asked Pederson to please make arrangements for a man to process him since he was naked.  Pederson immediately obliged, and a man processed Moore instead, bringing him a blue jumpsuit to put on.

We need not determine whether Pederson's conduct was "outrageous." Regardless of whether it was, we are compelled to affirm the district court's grant of summary judgment on Moore's claim for intentional infliction of emotional distress.  Moore was required to show that he suffered "severe" emotional distress stemming from Pederson's actions.  *Gallogly*, 970 So. 2d at 471.  But Moore made absolutely no argument suggesting how he had done that, either in his briefing

---

[12] Pederson contended that the towel remained on Moore throughout the arrest and right up until Moore's processing.  He further asserted that Moore had clothes with him in Pederson's vehicle because one of the two women brought Moore clothes to put on for when he bonded out of jail.  Pederson stated that he took Moore's clothes to the jail for him.  We also note that Moore's processing report shows that he was booked with a towel, meaning that under Moore's version of the facts, Pederson would have had to have stopped to pick up the towel from the ground when it fell off, or someone else would have had to have provided the towel to Pederson so that Moore could have it at the time that he was processed.  For purposes of evaluating the entry of summary judgment against Moore, though, we accept Moore's version of the facts.

22

before this Court or that before the district court, nor did he point to any facts evidencing that he suffered severe emotional distress.

Accordingly, we hold that Moore has not established a claim for intentional infliction of emotional distress because he has not shown that Moore suffered "severe" emotional distress as a result of Pederson's actions.

## VIII.

Home may be where the heart is,[13] but it cannot be where the government is—at least for purposes of conducting a *Terry*-like stop, in the absence of exigent circumstances. Today we clearly establish this as the law in this Circuit. But since the law was not clearly established on this point when Pederson arrested Moore, the district court did not err when it granted qualified immunity to Pederson and denied summary judgment to Moore. Nor did the court err in determining that Moore failed to establish a claim for intentional infliction of emotional distress. For these reasons, the district court's order is **AFFIRMED**.

---

[13] "Home is where the heart is" is a quotation often attributed to Pliny the Elder, also known as Gaius Plinius Secundus. Tragically and perhaps ironically, Pliny the Elder died trying to save his family and his friend Pomponianus from their homes in the aftermath of Mount Vesuvius's eruption.

23